**In the Matter of UNION SQUARE ASSOCIATES, LTD., Debtor.**

**Bankruptcy No. LR 82–867.**

United States Bankruptcy Court, E.D. Arkansas, W.D.

April 26, 1985.

On Motion to Alter or Amend July 22, 1985.

**534**

John M. Bilheimer, Little Rock, Ark, for James C. Becknell, Jr.

Allen W. Bird, II, Little Rock, Ark, for debtor.

## ORDER CONDITIONALLY CONFIRM-ING CHAPTER 11 PLAN OF REORGANIZATION

DENNIS J. STEWART, Bankruptcy Judge.

The matter of confirmation of the debtor's proposed amended chapter 11 plan of reorganization now pends before the undersigned. This complex of issues was transferred to the undersigned for determination after the actual hearing on confirmation was held and concluded by another judge, the Honorable Frank P. Barker, Jr. But the parties have consented to determination by the undersigned on the basis of the sound recordings of the hearing and the briefs which have been submitted. The evidence adduced and the arguments, considerations and legal authorities presented demonstrate the existence of a single principal genus of issues based upon whether the plan is in the best interests of creditors.[1] At the outset of the consideration of this constellation of issues, it must be noted that only classes I and II and III through VIII are impaired classes within the meaning of the Bankruptcy Code. Of these classes, those denominated as IV, VI and VII have affirmatively accepted the plan. Thus, it is the impaired and nonaccepting classes,[2] V and VIII with which the court must be concerned in determining whether they are offered, under the terms of the proposed plan of reorganization, at least as much value as they would have received in straight liquidation under chapter 7 of the Bankruptcy Code.[3]

### Class V

Class V is comprised of the Series B bondholders. The debtor's indebtedness to them is secured by a second mortgage on the "train station property" which was valued by the expert testimony of George Fox, Jr., at $1,475,000. It is this opinion testimony which this court, after review of the sound recording and the parties' briefs, has determined to accredit.[4] The first mortgage on the "train station property" is held by the Series A bondholders. They are owed by the debtor a cumulative total of $2,713,425 in indebtedness. Thus, it is quite clear from the evidence which has been adduced that, in straight liquidation under chapter 7 of the Bankruptcy Code, the class V creditors would receive nothing. This seems to be more than matched by the relevant provision of the plan which is now under challenge, to the effect that the class V creditors will share pro rata in any excess assets after secured creditors are paid. Accordingly, it is the ultimate finding and conclusion of this court that the class V creditors figure to receive at least as much under the proposed plan of reorganization as they would receive in straight liqui-

---

1. "Best interests of the creditors means only that ... the creditors must receive a value greater than they would receive under a forced liquidation." *In re Peoples Loan & Investment Co. of Fort Smith,* 410 F.2d 851, 857 (8th Cir.1969).

2. See §§ 1129(a)(7), (8) of the Bankruptcy Code.

3. See note 1, *supra.*

4. Uncontradicted opinion evidence, particularly when rendered by an admittedly qualified expert witness, ordinarily is accorded compelling weight. See *Matter of Walters,* 41 B.R. 511 (Bkrtcy.W.D.Mo.1984).

dation under chapter 7 of the Bankruptcy Code.

## Class VIII

Class VIII is composed of certain unsecured creditors.[4a] They are provided for in the proposed plan now before the court as follows: A "Compensation Fund" will be created in an amount equal to the equity which the debtor has in its assets above the secured indebtedness which are not needed to pay claims in class I, II or III as determined by the court. Thus, an arrangement is proposed whereby the unsecured interests of the debtor, if any, are made subject to the unsecured claims. This ordinarily satisfies the "best interests of creditors" test.

## The Issue of Value of the Train Station Property

Imbedded in the general issues above discussed in respect of classes V and VIII is the issue of the value of the train station property. If there is sufficient value in that property to cover substantially more than the amount owed to the Series A bondholders, then the plan which is now under consideration does not offer the Series B bondholders the value which they would receive in straight liquidation under chapter 7 and confirmation accordingly would not be appropriate. This is the position of the objecting creditor James Becknell, who contends that the valuation which the expert witness George Fox, Jr. places on the property is erroneous. As observed above, it was Fox's testimony that the property has a value of $1,475,000, which is significantly less than the $2,713,425 outstanding indebtedness to Series A bondholders. It is suggested to the court in this regard that, at a time prior to the hearing

in 1978, Mr. Fox estimated the value of the train station property to be much higher, some $4,465,000, a figure which would warrant both the Series A bondholders and Series B bondholders to be treated as fully secured creditors in these chapter 11 proceedings. But the evidence of such a prior inconsistent statement cannot be regarded as substantive evidence to support any possible finding of this court that the value is such as to in any respect constitute security for the Series B bondholders. " 'Prior statements of witnesses are hearsay and are generally inadmissible as affirmative proof.' ... such statements should not be introduced as substantive evidence, but should be used only to impeach credibility." *United States v. Palacios*, 556 F.2d 1359, 1362, 1363 (5th Cir.1977). "Of course, a statement which is otherwise hearsay evidence may be admissible as substantive evidence if it falls within one of the exceptions to the hearsay rule." Id. at 1363, n. 7. But no species of exception to the hearsay has been or can be suggested which would convert this prior statement into cognizable substantive or affirmative evidence.

It is true, of course, that an unexplained prior inconsistent statement may impeach the testimony of a witness and thereby diminish its weight. But there is no conflict in the substantive evidence of value.[5] Uncontradicted expert opinion evidence ordinarily has the effect of making a submissible case.[6] Further, changes of circumstances and the passage of time itself tend to offer a satisfactory explanation of the difference between the prior value and current value.[7] And given the limitations which apply to the inferences drawable by the bankruptcy court sitting as a trial

**4a.** The Class VIII creditors are described in the proposed plan of organization as follows: "Claim of all unsecured creditors not otherwise classified in this Article."

**5.** And see note 4, *supra.*

**6.** See note 4, *supra.*

**7.** The Becknell posthearing brief asserts that the impeached testimony of Mr. Fox must be "dis-

regarded." But its interior explanations for the prior inconsistent statement and its reasoning, however, weak, are all uncontradicted. The objecting creditor had a full opportunity to adduce contradictory evidence, and failed to do so. It is admitted in the Becknell posthearing brief that the property has been deteriorating because of poor property management.

court, the only rational course is for the finding of value to be made in accordance with Mr. Fox's opinion.

### The Potential Issue of Identity of the Debtor and the Series A Bondholders

The objecting creditor also intimates that the debtor in this case and the Series A bondholders are one and the same party. It seems to be recommended that the court employ a form of the traditional doctrine of "merger" in property law so as formally to recognize this alleged identity of the debtor with the creditors who constitute the Series A bondholders.[8] But, under the law of bankruptcy, such identification of entities with a debtor entity can be demonstrated only by "evidence that the debts and assets of the several entities were identical or 'hopelessly intermingled.'" *Matter of Perry, Adams, and Lewis Securities, Inc.*, 34 B.R. 155, 159, n. 6 (Bkrtcy.W.D.Mo. 1983). Such evidence has not been adduced in this case, and, therefore, the doctrine cannot be employed. But the substance of the objection which is being raised by Becknell is that it is inequitable for the claims of the Series B bondholders to be considered junior to those of the Series A bondholders, when the latter bondholders in whole or part may be "insiders" to the debtor and when it was the Series A bondholders' predecessors in interest (and current allies)[9] who were able to raise funds to purchase the property by selling the Series B bonds, whose claims they now wish to defeat in arrogating the property to themselves. Thus, in his brief filed on January 10, 1985, Beckness states in part as follows:

"In early 1984 ..., J.R. Hodges and William F. Smith, individually and through wholly-owned corporations, purchased all USA partnership interests and about 82% of the A bonds. They removed the professional management firm which had formerly been operating the Train Station and began to manage it themselves. With the counsel of [David R. Kane] and one of his associates, William G. Campbell, they embarked on a course of conduct to squeeze out all other ... creditors and Train Station lienholders, primarily the successors in interest to Historic Station [the original seller]. The plan of reorganization now before the court is part of that scheme.

"The plan provides for payment of priority claims, $1.5 million to A bondholders, and a small amount—probably between $100,000 and $150,000—to be divided among all other creditors, whose total claims will likely amount to somewhere between $1.5 million and $2.5 million. Since Mr. Hodges and Mr. Smith are both creditor and debtor, the effect of the proposed plan is to pay themselves back about what they paid for the A bonds, pay the few other A bondholders the same percentage, and exclude everyone else."

But there is no statement or showing that the Series A bondholders misled the Series B bondholders as to the junior character of the security interest which was being sold them or being retained by them. In fact, it is admitted otherwise in Becknell's posthearing brief, that it was expected that the Series B bondholders would not be paid for some time after the Series A bondholders had been paid.[10] Confirmation of the plan cannot therefore be defeated on the grounds that it gives precedence and pref-

---

**8.** There is an imperfect identification of the entities in the brief. For one thing, it is asserted that "the A bondholders ... are *mostly* Mr. Hodges and Mr. Smith themselves. (Emphasis Added). And it is admitted that the situation at bar is only "similar" to the "straight-forward or simple set of facts as faced the English chancellors when they developed the doctrine of merger" to the effect that, if the fee owner acquired a mortgage, the "mortgage lien simply ceased to exist."

**9.** See note 8, *supra.*

**10.** See p. 2 of the posthearing brief filed on January 10, 1985, to the effect that "[i]t had been anticipated all along that it would be some time before USA's payments would be great enough to service the B bond debt."

erential treatment to the Series A bondholders over the Series B bondholders.

■ The objecting party alternatively requests, at least by implication, that the court grant recognition to the inequities disclosed by the circumstances by, for instance, permitting them to retain their lien in the event that the train station property appreciates. Ordinarily, in a pure reorganization case, in order to retain a lien on collateral until its claim is fully paid, an undersecured creditor must timely file an election to be treated as a fully secured creditor under § 1111(b)(2) of the Bankruptcy Code.[11] In such an instance, however, the amount paid on the secured claim is discounted to the value of the security and any claim for a deficiency is waived.[12] There is no statement or showing that there has been a timely § 1111(b)(2) claim in this case.

In view of the fact, however, that liquidation of the security is within the contemplation of the plan now before the court,[13] it would defy reason and common sense to deprive the Series B bondholders of any secured value over that which will satisfy Series A claims which may be realized by full or partial liquidation of the property. Therefore, confirmation of the plan will be conditioned on the Series B bondholders' receiving, pro rata, any excess of the indebtedness to the Series A bondholders upon sale of the train station property. Cf.

*In re Fursman Ranch,* 38 B.R. 907 (Bkrtcy.W.D.Mo.1984).[14]

■ If it is true that it is inequitable that all or some of the present Series A bondholders should be preferred over the Series B bondholders, then the appropriate step for the offended creditors to take is to seek equitable subordination, pursuant to § 510 of the Bankruptcy Code, with respect to all or some of their claims, on a showing that equity demands, with respect to each of the claimants whose claims are sought to be subordinated, subordination under *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and its progeny.[15] Under the condition of confirmation imposed by the foregoing paragraph, if and when Series A claims are subordinated, the secured value of Series B bondholder claims will be *pro tanto* enhanced.[16]

It is therefore, for the foregoing reasons,

ORDERED that the proposed plan of reorganization now before the court be, and it is hereby, confirmed on the following conditions:

(1) that, upon liquidation of the train station property, the class of Series B bondholders receive pro rata all value thereof in excess of that necessary to pay the indebtedness to the Series A bondholders;

11. That election permits retention of a lien to the full extent of the balance due on the claim, but the elector is paid only the value of its collateral and, further, waives any right to assert a deficiency. In this case, however, there appears to have been no timely § 1111(b)(2) election.

12. See § 1129(a)(7) of the Bankruptcy Code.

13. Circumstances may arise in the future, for instance, which would warrant the court in converting the chapter 11 proceedings to chapter 7 proceedings.

14. In that case, it was held that property might be returned to a creditor in return for creditors equal to its value as found by the bankruptcy court, but that, if the creditor sold it for less, he could request the court to readjust the value. A similar principle works in this matter, only in the obverse.

15. The bankruptcy court is granted a broad mandate under these authorities to deal appropriately by subordinating claims when it is equitable to do so.

16. The Becknell brief suggests that this court should go further and require the debtor to pay the Series B bondholders according to its ability to pay for an undefined period of time in the future. But there is simply no authority for the bankruptcy court, in a chapter 11 case, to require substantially more payment than the creditors would receive in chapter 7. In *In re Estus,* 695 F.2d 311 (8th Cir.1982), it is recognized that the bankruptcy court may do so in chapter 13 proceedings. But that power is justified on the grounds that there is a "broadened scope" of discharge in chapter 13 and that, in that respect, chapter 13 proceedings are distinct from chapter 11 and chapter 7 proceedings.

(2) that any discharge be withheld until full consummation of the confirmed plan of reorganization;

(3) that the bankruptcy court retain jurisdiction for all purposes until full consummation of the confirmed plan of reorganization; and

(4) that the debtor continue to file, until further order of court, any and all operating reports required by the Rules of Bankruptcy Procedure and the local rules of practice.

## ON MOTION TO ALTER OR AMEND

On April 30, 1985, this court formerly entered its order conditionally confirming the debtor's proposed plan of reorganization under chapter 11 of the Bankruptcy Code over the objection of James C. Becknell and Associates that it did not provide any certain level of payments to the junior lienholders ("the class 2 bondholders"). The reasoning which this court employed in denying the objection and conditionally confirming the plan was expressed in the order of April 30, 1985, as follows:

"Imbedded in the general issues above discussed in respect of classes V and VIII is the issue of the value of the train station property. If there is sufficient value in that property to cover substantially more than the amount owed to the Series A bondholders, then the plan which is now under consideration does not offer the Series B bondholders the value which they would receive in straight liquidation under chapter 7 and confirmation accordingly would not be appropriate. This is the position of the objecting creditor James Becknell, who contends that the valuation which the expert witness George Fox, Jr. places on the property is erroneous. As observed above, it was Fox's testimony that the property has a value of $1,475,000, which is significantly less than the $2,713,425 outstanding indebtedness to Series A bondholders. It is suggested to the court in this regard that, at a time prior to the hearing in 1978, Mr. Fox estimated the value of the train station property to be much higher, some $4,465,000, a figure which would warrant both the Series A bondholders and Series B bondholders to be treated as fully secured creditors in these chapter 11 proceedings. But the evidence of such a prior inconsistent statement cannot be regarded as substantive evidence to support any possible finding of this court that the value is such as to in any respect constitute security for the Series B bondholders. ' " 'Prior statements of witnesses are hearsay and are generally inadmissible as affirmative proof.' ... such statements should not be introduced as substantive evidence, but should be used only to impeach credibility." ' *United States v. Palacios*, 556 F.2d 1359, 1363 (5th Cir.1977). ' "Of course, a statement which is otherwise hearsay evidence may be admissible as substantive evidence if it falls within one of the exceptions to the hearsay rule." ' *Id.* at 1363, n. 7. But no species of exception to the hearsay has been or can be suggested which would convert this prior statement into cognizable substantive or affirmative evidence."

■ The objecting creditors have, in their motion to alter and amend the order of conditional confirmation, asserted that it was material error for this court to conclude that the prior appraisal of the witness Fox was offered solely as impeachment evidence; that, to the contrary of the court's findings and conclusions, the written appraisal was offered and accepted as substantive evidence and not solely as impeachment evidence.[1] This court has thor-

---

1. In its motion of May 9, 1982, the Becknell group pertinently states that "the Court apparently believed that the 1978 appraisal had been introduced in ... evidence only for purposes of impeaching the testimony of the appraiser as to the property's current value ... [but] the 1978 appraisal was introduced in ... evidence to establish substantively that the value of the property was the $4,465,000 reflected in the appraisal.... Mr. Fox testified at a hearing held on October 12, 1984 that the property was worth $1,475,000. Also at that hearing, however, there was introduced in ... evidence the bound transcript of the proceedings relating to

oughly reviewed the tape recording of the confirmation hearing, which was conducted by the Honorable Frank P. Barker, Jr., and has discovered that that record is quite ambiguous as to whether the admission of the appraisal was solely as impeachment, or as substantive evidence. It was initially offered during the cross-examination of Mr. Fox by counsel for the objecting creditor in connection with the offer of other associated documents and ostensibly as extrinsic evidence of a prior inconsistent statement.[2] Counsel for the objecting creditor then asked counsel for the debtor whether he had any objection to admission of the entire document which included the prior appraisal. Counsel for the debtor responded that he did not desire to concede to the admission of any part of the document which might be irrelevant.[3] Again, at the conclusion of the entire hearing, counsel for the objecting creditor repeated his offer in evidence of the entire document. Again, counsel for the debtor repeated his objection to so much of it as was irrelevant, an objection which the court sustained.[4] The offer of evidence admissible only for impeachment as substantive evidence is a species of irrelevancy. See, e.g., *United States v. Dye*, 508 F.2d 1226, 1234 (6th Cir.1974) ("The courts should be alert to prevent abuse of the prior inconsistent statement rule by the prosecution's use of extra-judicial statements in the guise of impeaching witnesses, when the true purpose is to get before the jury substantive evidence which is not otherwise available.") This court therefore concludes on the basis of the record before it that the evidence of Mr. Fox's prior appraisal was, as set forth in the now challenged order of conditional confirmation, admitted only as impeachment evidence and was neither admissible nor admitted as substantive evidence.

■ Even if it could be regarded as substantive evidence, however, it could not control the issue of value. The later appraisal of Mr. Fox must, under the circumstances, be accorded much greater weight. "[T]he opinion of a[n] ... expert is entitled to no more weight than is warranted by his individual knowledge, expertice, and *reasons." Manual for Complex Litigation* ¶ 3.40, pp. 139–140 (5th ed. 1982) (Emphasis added.) The reasons given by Mr. Fox in his testimony in support of his later appraisal were much more complete and more persuasive than those set forth in the writing embodying his earlier appraisal.[5] In fact, the reasons supporting the prior appraisal are exceedingly cryptic and shorthand.[6] Further, without any contradiction

---

the issuance of the bonds in question ... The transcript contained Mr. Fox's 1978 appraisal, stating the value to be $4,465,000.00. At that point, therefore, the 1978 appraisal was in evidence, and it was in evidence for all purposes. No party made any hearsay objection to any part of the bond transcript, and no party requested that any part of it be admitted only for some limited purpose.

**2.** As is noted in the further context of this memorandum, the manner of the offering of the extrinsic evidence of the prior inconsistent statement revealed no other purpose but that of impeachment.

**3.** As noted below in the text hereof, such an objection may be sufficient to exclude the prior inconsistent statement as substantive evidence. As a matter of law, unless the law is waived by non-objection, in the federal courts, a prior inconsistent statement is irrelevant as substantive evidence.

**4.** See note 3, *supra.* Again, counsel for the debtor objected that the exhibit was "99.44% irrelevant." The court then stated that the objection was sustained with respect to the "99.44% that is irrelevant."

**5.** This is not to say that persuasive reasons do not exist which support the prior appraisal, but only that they have not been demonstrated evidentiarily in the course of the confirmation hearing.

**6.** It further appears that the greater portion of the $4,465,000 value then attributed to the property was on account of projected income. The "raw land value" was $245,000. But the value of the project was arrived at by assuming that, according to current market averages, the projected annual income of $375,082 was 8.4% of the value of the project. In working this estimate on December 28, 1978, Mr. Fox stated that it was guarded because of "all the inherent risks attached to real estate, as well as the uncertainty of any projection of future income and expenses in a rapidly changing economy" and "subject to completion [*inter alia* ], of all rentable area."

in the evidence, Mr. Fox explained the difference between his earlier appraisal and his later appraisal as being based upon the building's "going down the tubes" since the first appraisal because of the loss of tenants, the well-known fact of insolvency proceedings, and a decline in condition of the building.[7] When this explanation has not been contradicted, the court must accept the later appraisal as governing the issue.

Therefore, for the separate and independent reasons that (1) the prior appraisal was not admitted as substantive evidence of value and (2), even if it were, it is entitled to much less weight than the latter appraisal, the motion of the Becknell group to alter or amend the order of conditional confirmation must be denied. Their failure to offer in evidence an independent appraisal has proven fatal to the objecting creditors' contentions.

## II

The debtor has also filed a motion to alter or amend the order of conditional confirmation insofar as it provides that the junior mortgagees, the class 2 bondholders, should receive any excess in value of the property beyond that which is necessary to pay the senior mortgagees, the class 1 bondholders.[8]

�full■ In this regard, because of time considerations, the court's order of confirmation was perhaps too cryptic. But, in stating that liquidation must be considered as being within the contemplation of the debtors, this court centered its focus on the testimony of Mr. Fox in the course of the confirmation hearing. In that testimony, he characterized the principal asset of the debtor, as observed above, as having "gone down the tubes" and he related other facts

in support of this conclusion. If his testimony was to be accepted on the value of the building, it appeared that the admissible facts stated by him must also be considered and accepted on the issue of feasibility of the plan. This placed the court between the Scylla of finding the plan infeasible within the meaning of section 1129(a)(11)—in the sense that it was not unlikely to be followed by "liquidation or the need for further financial reorganization"—and the Charybdis of confirming the plan as one which itself proposed or contemplated liquidation. The court chose the latter, in which instance the failure of the class of bondholders holding the junior mortgage to make the section 1111(b)(2) election—which is ordinarily necessary to preserve any interest of that class in the increasing value of the collateral—is immaterial. For section 1111(b)(1)(B)(ii) makes the election unnecessary in the case of a plan contemplating liquidation. "[T]he reason for the exception contained in section 1111(b)(1)(B)(ii) is that a secured creditor who has the opportunity to protect his position by bidding in debt at the sale of his collateral and recovering his collateral, has the benefit of his bargain and requires no special protection." 5 Collier on Bankruptcy ¶ 1111.02[4], p. 1111–27 (15th ed. 1985). Thus, because of the immateriality of the section 1111(b)(2) election in this case, the continuing lien of the second mortgagees is not lost and—if liquidation ensues—it will take effect. But the continuing of the reorganization process can entail—for the reasons stated above—no payments to the second mortgagees in the absence of equitable subordination of some or all of the claims of the first mortgagees.

Accordingly, for the foregoing reasons, it is hereby

---

7. See the conditions of the prior appraisal adverted to in note 6, *supra*.

8. The challenged order of the court confirmed the debtor's plan of reorganization on condition, *inter alia* that:

   "(1) upon liquidation of the train station property, the class of Series B bondholders receive pro rata all value thereof in excess of that

necessary to pay the indebtedness to the Series A bondholders."
The condition is declarative of the law of liquidation and the principles set out in *In re Fursman Ranch*, 38 B.R. 907 (Bkrtcy.W.D.Mo.1984) and as stated in the challenged order, is primarily made against the possibility that the reorganization proceedings may be converted to liquidation proceedings in the future.

ORDERED that the motions of James C. Becknell and Associates and the debtor to alter or amend the order of conditional confirmation of April 30, 1985, be, and they are hereby, denied.