**In re B.W. ALPHA, INC., Debtor.**

**Bankruptcy No. 686–60051–11.**

United States Bankruptcy Court,
N.D. Texas,
San Angelo Division.

Aug. 19, 1988.

Samuel S. Allen, Smith, Carter, Rose, Finley & Hofmann, San Angelo, Tex., for debtor.

DeWayne (Cooter) Hale, Pulliam, Hale, Spencer, Goodman, Stanley, Pronske & Trust, P.C., Dallas, Tex., for Bank.

Terri Harris Motl, Griffis, Woodward, Colia & Motl, San Angelo, Tex., for John D. Burk.

Billy W. Boone, Abilene, Tex., for J.D. Burk.

## MEMORANDUM OF OPINION ON CONFIRMATION OF DEBTOR'S PLAN OF REORGANIZATION

JOHN C. AKARD, Bankruptcy Judge.

J.D. Burk's dream has turned into a nightmare monster that threatens to devour him financially. The Plan of Reorganization proposed by the Debtor in this case is an attempt to pay something to the unsecured creditors and bring an end to the nightmare.

### Facts

The Debtor's only asset is the Cactus Hotel located in San Angelo, Texas. The hotel was constructed in 1928 by Conrad Hilton. It was one of the early hotels in his subsequently-famous hotel chain. The Cactus was the social and business center of San Angelo for many years. Like many other downtown hotels, it suffered a decline in the post World War II era. The hotel was sold by Hilton and went through several changes of ownership over the years. In 1983 it was operated as a retirement center by a church-related organization. Because it did not have up-to-date fire prevention apparatus, the building could no longer be used for that purpose. John D. Burk, who is in the construction business, conceived the idea of acquiring the hotel and completely remodeling it into apartments for use by retirees. He and Ken Williams, an architect, formed B.W. Alpha, Inc. for these purposes. Burk provided the $200,000.00 with which the corporation acquired the hotel. The corporation's stock is held by John D. Burk (30%), Mike Burk (1%), J.D. Burk (the father of John D. Burk and Mike Burk) (59%), Ken Williams (5%) and Barbara Petrosky (Williams' mother-in-law) (5%).

On May 13, 1985 the corporation secured two loans totaling $1,500,000.00 from the First City National Bank of San Angelo (Bank) to finance the project. The loans were personally guaranteed by J.D. Burk and the remodeling work was done by John D. Burk's construction company. At present, the first and second floors of the hotel remain in their prior condition. A barber shop, a beauty shop and other small businesses occupy several of the street-front first floor retail spaces. The corporation leased space on the twelfth (top) floor to communications companies which installed antennae on the roof of the building. For a time, the restaurant on the second floor was leased to an operator, but that lease was terminated. The personal property in the building consists principally of the restaurant furniture and equipment. The third and fourth floors were remodeled into apartments, but none are occupied. Floors five through eleven were stripped of furniture, walls and fixtures. A sprinkler system was installed on some floors, but basically these floors are only "shells". A modern three story parking garage is adjacent to the hotel.

The remodeling costs ran substantially more than the parties anticipated. Disputes developed over various matters, in-

cluding the fact that John D. Burk's construction company charged the Debtor 5% for overhead and profit. J.D. Burk dismissed the construction company from the job. Unfortunately, financial problems encountered on the project caused a rift in the family relationship.

These proceedings under Chapter 11 of the Bankruptcy Code were filed on April 11, 1986 when the Bank threatened to foreclose on the hotel. By order entered March 30, 1987 J.D. Burk agreed to provide funds to the Debtor which, in turn, made periodic payments to the Bank. As a result, the Bank agreed not to proceed against J.D. Burk during the pendency of the Chapter 11 proceeding. The Debtor felt that the hotel was worth substantially more than the obligation to the Bank, so the order provided that payments would be applied to interest.

The Debtor requested a hearing to value the hotel. Although the hearing was continued to give the Bank an opportunity to secure an appraiser, the Bank did not present appraisal testimony. After considering the Debtor's appraisal testimony, and considering matters presented at hearing, the Court valued the hotel at $1 million for purposes of this Plan.

Throughout this Chapter 11 proceeding the Debtor attempted to sell the hotel, but those efforts were unsuccessful. The Debtor's Amended Plan of Reorganization, filed April 28, 1988, (Plan), stated:

> The Debtor believes that the development and operation of the Hotel Cactus as a "mixed use" facility by the Debtor is impossible. The time and money required to operate the hotel and repair and refurbish it sufficiently to maintain a sufficient income level proved to be an intolerable financial strain on the Debtor. In addition, the actions of certain shareholders, creditors and other third parties have caused harm or damage to the Debtor, thereby accentuating its financial problems. The Debtor has been unable to sell the Hotel Cactus or refinance it. The Debtor does not have the funds to develop the Hotel Cactus property any further.

### The Plan

The Debtor's Plan provided that the hotel and the personal property in the hotel would be surrendered to the Bank in full cancellation of the approximately $1,600,-000.00 indebtedness to the Bank. The Debtor's calculations were composed of four elements:

1. During the Chapter 11 proceedings the Debtor paid the Bank $137,136.00 pursuant to agreed orders which provided that the payments would be applied to interest on the notes. The Debtor asserted that since the collateral is actually not worth what is owed on the obligation, these payments should be applied to principal rather than interest.

2. As additional collateral, J.D. Burk pledged to the Bank a retail store in Paris, Texas occupied by Sears, Roebuck & Co. The Bank foreclosed on that property and the price bid at the foreclosure sale was $400,000.00. The Debtor felt that the amount bid was much less than the value of that property. At the confirmation hearing the Debtor attempted to introduce testimony to support this contention. The Court excluded the testimony because the Debtor never owned any interest in the store and the dispute was between J.D. Burk, individually, and the Bank.

3. The Debtor proposed to surrender the equipment in the hotel to the Bank. The Debtor valued this equipment at $100,000.00, but testified that, even at a liquidation sale, it would have a value of $40,000.00. There are no liens on the equipment. The restaurant equipment was purchased by the Debtor for $67,500.00 from another bank when it foreclosed on the restaurant. To these amounts, the Debtor added various items of personal property. It appears to the Court that a number of items which the Debtor is claiming as personal property are, in fact, fixtures which belong to the hotel and

appear to have been bought by the Debtor when it purchased the hotel.

4. The Debtor proposed to quitclaim the hotel to the Bank. This procedure is technically flawed because there are mechanic's liens against the property. If the property were conveyed to the Bank, by quitclaim or otherwise, the Bank would take it subject to the existing mechanic's liens. The Debtor asserts that for these purposes the property should be valued at $1 million which the Court found to be the value of the property. The same result can be achieved by allowing the Bank to foreclose its liens on the hotel but requiring the Bank to bid a minimum of $1 million at the foreclosure sale.

The Debtor's Plan totaled these amounts and concluded that it had paid its debt to the Bank in full. Therefore, the Plan contemplated that these conveyances would fully release J.D. Burk from all obligations to the Bank under the notes made in connection with the hotel and that the parties would exchange mutual releases. At the confirmation hearing, J.D. Burk agreed to delete the release provisions.

The Plan further provided a contribution from J.D. Burk to the Debtor sufficient to provide a 25% distribution to the unsecured creditor class which consists of persons who provided some of the labor and materials on the hotel's remodeling. Although some suppliers filed mechanic's liens, the Plan treated them as unsecured. J.D. Burk stated that he was able to make the required cash contribution.

J.D. Burk asserted a priority administrative expense of $240,000.00, representing funds paid to the Debtor post-petition in order to allow the Debtor to pay the Bank as previously ordered as well as to pay other operating expenses. Under the Plan, he waived that administrative expense.

### Discussion

■ The claims of insiders, including those of J.D. Burk and his two sons, were subordinated to the claims of unsecured creditors and they were not scheduled to receive any distribution under the Plan. John D. Burk Construction Company, Inc., objected to the classification of its claim as that of an insider. The testimony is not clear whether John D. Burk performed the construction work under the assumed name of John D. Burk Construction, or through his corporation, John D. Burk Construction Company, Inc. The term "insider" is defined in § 101(30) of the Bankruptcy Code [1] to include an officer or director of the debtor corporation and an affiliate. John D. Burk is an officer and director of the Debtor and his construction company is an affiliate of the Debtor as that term is defined in § 101(2) since John D. Burk owns all the stock of John D. Burk Construction Company, Inc. The Court finds the classification is proper.

■ The Plan specifically provided that the Debtor received no discharge but, as originally proposed, called for a discharge, compromise and settlement of all claims against J.D. Burk individually. The Bankruptcy Code does not provide for discharge of guarantors' obligations. The rights of creditors against guarantors is specifically reserved in § 524(e), which states that "... discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *Id., See, e.g., United States v. Stribling Flying Service, Inc.,* 734 F.2d 221 (5th Cir.1984). In *Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th Cir.1987) the discharge of a guarantor in a confirmed plan was upheld on a *res judicata* theory where the creditor participated in the confirmation process and did not object to, or appeal from, the confirmation of the plan. In the instant case the Bank, which holds the guaranty, vigorously opposed confirmation of the Debtor's Plan. This Court could not have confirmed the Plan with release of the guarantor as part of its terms over the Bank's objection. Thus, the removal of those provisions from the Plan at the commencement of the confirmation hearing was appropriate.

**1.** The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are to sections in the Bankruptcy Code.

Although the corporate Debtor proposed the Plan, it is obvious that the principal purpose of the plan was to resolve J.D. Burk's financial difficulties—particularly those with the Bank. The Plan sought to do by indirection what it could not do directly when it asserted that the value of the assets proposed to be conveyed to the Bank fully satisfied the Bank's claim. If the claim of the Bank is fully satisfied then, of course, there would be no debt and J.D. Burk's guaranty would be released.

The Court may confirm the Plan "only if" all of the requirements of § 1129(a) have been met. The Bank is appropriately classified separately. Under § 1129(a)(8) each class either must accept the Plan or be unimpaired. The Bank voted against the Plan and, since the Plan alters its legal rights, it is clearly impaired under § 1124(1).

The Debtor sought confirmation under § 1129(b) which provides that if the requirements of § 1129(a)(8) are not met, the Plan can be confirmed if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The Debtor asserted that the fair and equitable test is satisfied by § 1129(b)(2)(A)(iii) because the Bank receives the "indubitable equivalent" of its claim.

The Debtor also asserted that J.D. Burk's contributions to fund this Plan along with the waiver of his claims provided consideration for the Bank's release of his obligations. However, any funds J.D. Burk contributed are to be used to pay unsecured creditors and, thus, cannot be said to provide consideration to the Bank. Certainly, some of the funds which he previously paid into the Debtor were paid to the Bank, but they were not paid with an agreement to release J.D. Burk and cannot be used retroactively for that purpose.

The Debtor asserted that by surrendering to the Bank property of a fair market value equal to the amount of the Bank's claim (by the Debtor's calculations the value actually exceeded the amount of the Bank's claim), the Bank received the indubitable equivalent of its claim. In support of this assertion, the Debtor cited *In re Fursman Ranch*, 38 B.R. 907 (Bankr.W.D. Mo.1984) and *In re Bernard*, 70 B.R. 181 (Bankr.E.D.Ark.1986). The Bank countered that the indubitable equivalent must be provided in cash or cash equivalents, citing *In re Sandy Ridge Development Corp.*, 77 B.R. 69 (Bankr.M.D.La.1987), *aff'd*, No. 88–3072 (5th Cir. July 5, 1988).

While the Court feels that *Sandy Ridge* is too restrictive, it cannot find that the conveyance of the Cactus Hotel to the Bank constitutes the "indubitable equivalent" of the Bank's claim. In order to be the indubitable equivalent, the property must produce a cash flow or be capable of being sold within a reasonable time so that the creditor can realize cash. In spite of its concerted efforts, the Debtor was unable to sell the hotel; its Plan admits that failure. Shifting the burden of sale to the Bank cannot be considered the indubitable equivalent of the Bank's claim. Were it not for the Chapter 11 proceeding, the Bank could have foreclosed on the hotel, proceeded against J.D. Burk, or exercised both of those options several years ago. Giving the Bank a partially remodeled building, which the Debtor has been unable to sell for two years, certainly cannot be said to be the indubitable equivalent of the Bank's claim.

### Conclusion

Truly, the Cactus Hotel is a unique structure. It is listed on the Historic Register. It has a proud and glorious past. But it requires substantial remodeling and refurbishing before it can again become economically viable. Under present conditions it is questionable whether it can become economically viable, even with refurbishing, in the next several years. The Debtor's valiant and public-spirited efforts to bring it to economic viability have lasted several years but, unfortunately, have been unsuccessful. On the facts of this case, the Court cannot find that the conveyance of the hotel to the Bank constitutes the indubitable equivalent of the Bank's claim. The revitalization of the Cactus Hotel was J.D. Burk's dream. Undoubtedly there are many in San Angelo, including the Bank,

who would be very anxious to see the hotel revitalized. However, they cannot be forced to involuntarily contribute to that project. In the Court's judgment, the Debtor's Plan proposed an excellent settlement of the obligations owed the Bank by both the Debtor and J.D. Burk. However, the Bank was not obligated to accept that settlement. It was free to accept or to oppose the Plan and, in this case, it chose to oppose it.[2] Therefore, the Court has no choice but to deny confirmation of the Debtor's Plan.

Order accordingly.[3, 4]

**2.** The United States Supreme Court stated: "The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents' reorganization plan was confirmed. But that determination is for the creditors to make in the manner specified by the Code. 11 U.S.C. § 1126(c). Here, the principal creditors entitled to vote in the class of unsecured creditors (i.e., petitioners) objected to the proposed reorganization. This was their prerogative under the Code, and courts applying the Code must effectuate their decision." *Norwest Bank Worthington v. Ahlers*, —— U.S. ——, 108 S.Ct. 963 at 986, 99 L.Ed.2d 169 (1988).

**3.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.

**4.** A postscript. The Fifth Circuit's opinion in *Sandy Ridge Development Corporation v. Louisiana National Bank (In re Sandy Ridge Development)*, No. 88–3072 (5th Cir. July 5, 1988) has just come to the Court's attention (available August 8, 1988, on WESTLAW FBKR–CS). The Fifth Circuit affirmed the Bankruptcy Court and the District Court (which adopted the opinion of the Bankruptcy Court as its own) and concluded "that indubitable equivalent cannot be established merely by appraisals of real estate." The Court said "the indubitable equivalent of the original security must be one which is completely compensatory, with adequate assurance that the secured creditor will be paid." The Court found "that the proposed plan does not furnish (the secured creditor) with the indubitable equivalent essential for a cram-down and that the plan was not filed in good faith because its apparent purpose was not the salvaging of a business but was, rather, an attempt to discharge non-debtor guarantors." Because of its finding that the plan was not filed in good faith, the Fifth Circuit remanded the case to the District Court for consideration of the imposition of sanctions. The Debtor had valued one of the principal parcels of real estate at $2,450,000.00 and sought to use that value to satisfy the indebtedness of one of the secured creditors, but the Bankruptcy Court found that parcel to have a value of $1,700,000.00. Undoubtedly the Fifth Circuit thought this difference was sufficient to make this an egregious case.

This Court fervently hopes that *Sandy Ridge* does not become the basis for threats of sanctions every time a lawyer attempts a new and innovative theory on behalf of his client. Since its beginning in England, the common law has grown and adapted to current society through the industrious efforts of lawyers searching for ways to benefit their clients. The threat of sanctions where a new theory is not accepted by the Court would certainly stifle these historically approved efforts. The United States District Court for the Northern District of Texas, sitting *en banc*, recently made a plea for collegiality among the Bar and set forth guidelines to encourage cooperation among Bar members. *Dondi Properties Corp., v. Commerce Savings & Loan Ass'n*, 121 F.R.D. 284 (N.D.Tex.1988). I am afraid that the Fifth Circuit's suggestion in *Sandy Ridge* will be a signal to some lawyers to file more motions for sanctions, thus diverting the courts from the substantive issues at hand and turning the cases into personal battlegrounds between the lawyers. In the process collegiality would be destroyed. Hopefully, this fear will not be realized.

There are a number of differences between *Sandy Ridge* and the case at hand, including the facts that the Debtor used a value found by the Court, the proposed contributions by J.D. Burk to fund the payments to unsecured creditors, the postpetition granting of a lien on the store in Paris, Texas to the Bank as additional collateral, and the postpetition payments to the Bank. The Court feels that this case was filed in good faith.