**In re FURSMAN RANCH, Debtor.**

**Bankruptcy No. 82–02739–S–11.**

United States Bankruptcy Court,
W.D. Missouri.

April 6, 1984.

**908**

Stephen B. Strayer, Kansas City, Mo., for debtor.

Benjamin F. Mann, Kansas City, Mo., for Kansas Prod. Cr. Assn.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

In the plan proposed by debtors, interest on the secured debt was to be paid at 8.5%. Two classes of secured creditors rejected the plan on that ground, also asserting that the plan was not feasible. In an Order dated December 2, 1983, the Court sustained the objection to the proposed interest rate and directed that the plan be redrawn to conform to the rate designated.

Debtor thereafter filed an amended plan which proposed to convey to Federal Land Bank (Land Bank) and to Northeast Kansas Production Credit Association (PCA) a portion of the real property in which the creditors held security interests while paying for the remaining retained real property in cash. An evidentiary hearing was held on this proposal. After the taking of evidence the Court ruled from the bench that this plan could not be confirmed because the values assigned by debtor to the real property to be conveyed to the creditors were too high. Debtor was given time to make an alternate proposal and did so, reducing the values of the real property be conveyed.

Both Land Bank and PCA objected to this 3rd amended plan as to the value assigned to the real property and feasibility. A hearing was held at which time the parties appeared by counsel and representatives. Evidence was heard and the matter taken under advisement.

Because the creditors have rejected the plan, if there is to be confirmation it must be in accordance with the provisions of Section 1129(b) of the Code, Title 11, U.S.C. Generally a plan may be confirmed under this section "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims ... that is impaired under, and has not accept-

ed, the plan". As to secured claims, to be fair and equitable, the plan must provide:

"(i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the lien securing such claims, free and clear of such lien, with such lien to attach to the proceeds of such sale, and the treatment of such lien on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims".

As to property to be kept by debtor, the creditors will retain their liens. As to the property proposed to be surrendered, the lien will merge into possession by the secured creditor. The balance of the claim will be paid by deferred cash payments at the interest rate previously set by the Court. There is no sale proposed. It would appear that the plan proposed to give creditors the indubitable equivalent of their claims.

### I

The concept of indubitable equivalence coined in *In re Murel Holding Corporation*, 75 F.2d 941 (2d Cir.1935) arose in a factual context in which the holder of the first mortgage was asked to defer repayment of its claim, except for interest, for a period of ten years. The Court noted that confirmation of a reorganization without the consent of a secured creditor must be in the context of adequate protection that

was "completely compensatory". 75 F.2d at 942. The court held that a creditor was entitled to either money or collateral and could not be compelled to wait a long time when adequate protection was dubious.

Whether expressly or otherwise the concept of adequate protection by indubitable equivalency is well settled in the case law. *In re Cooper*, 22 B.R. 718 (Bkrtcy.E.D.Pa. 1982); *In re Greenwood Bldg. Supply, Inc.*, 23 B.R. 720 (Bkrtcy.W.D.Mo.1982); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bkrtcy.S.D.N.Y.1982). Here the creditors concede that the value of the assets exceed the claims against them. The real issue to creditors is feasibility.

But it is necessary to discuss the concept of adequate protection in order to evaluate whether the plan here gives creditors the indubitable equivalent of their collateral. The Court holds that there is no statutory bar in the Code to the plan proposed here to return part of the collateral and pay for the balance. Cf. Section 1124 of the Code.

## II

There is a dispute as to whether debtor is taking a proper credit for the collateral it will surrender to Land Bank and PCA. The initial payback was rejected by the Court because the real estate values were too high. Land Bank property was valued at $600 per acre and PCA land at $1,000 per acre. In the calculations supporting the third amended plan debtor values the real estate from $475 to $780 per acre. Land Bank and PCA have requested the appointment of an independent appraiser to provide unbiased testimony as to the value of the real estate to be surrendered.

There has been testimony with respect to those values, based upon actual sales. While additional testimony may enable the Court to make more precise choices within the range of values, there is no dispute that appraisals are only estimates and even the price obtained at sale is influenced by the type of sale conducted and the amount of time available to find buyers. *Matter of Crockett*, 3 B.R. 365 (Bkrtcy.N.D.Ill.1980). The motion for the appointment of an inde-pendent appraiser is denied as providing only surplusage.

When a lender takes a secured position in real estate it does so based upon a purchase price and current values as well as its best estimate of the future value of the property. None of these factors is insurance against a loss at the time of default and foreclosure. It is appropriate, therefore, for the Court to evaluate the real estate in the context of this plan, and not require that debtor sell the property or that creditor dispose of it before a value is fixed.

The land to be surrendered is both pasture and cropland. Three tracts are 80, 240 and 320 acres respectively and the fourth is 1187 acres. Generally, prices per acre for small tracts are better than those for larger tracts. Cropland is more valuable than pastureland. Substantial evidence has been introduced as to comparable sales and soil composition. Debtors have owned the property for so many years that purchase prices are not persuasive. The market is mildly depressed but there is activity.

No evidence was introduced to show the sale price of a large tract. Comparables for tracts of up to 320 acres were presented. These ranged from $269 per acre to $800 per acre. In its proposal debtor values the property from $475 to $780 per acre. The highest value is for cropland in smaller tracts.

The Court is obliged to value collateral "in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing ... on a plan affecting such creditor's interest". The legislative history suggests that the valuation is to be made on a case by case basis, consistent with the time of the valuation. Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 68, U.S. Code Cong. & Admin.News 1978, p. 5787, reprinted in App. 3 Collier on Bankruptcy (15th Ed.); see 3 Collier on Bankruptcy ¶ 506.04 (15th Ed.) where the commentator states:

"In the usual instance in which the nature of the debtor's prospects are not absolutely clear, the valuation should properly take all material possibilities into consideration and weigh their likelihood in arriving at a value. Thus, it is probably more appropriate to view the varying bases and manners of valuation as establishing a range of possible values as opposed to a finite set of alternatives". 3 Collier on Bankruptcy, ¶ 506.04 at p. 506–24. *Barash v. Public Finance Corp.*, 658 F.2d 504, 511 (7th Cir.1981); *In re Damron*, 8 B.R. 323 (Bkrtcy.S.D. Ohio 1980).

■ Because the debtor is surrendering the property to the creditor, foreclosure is not necessary. Creditors can dispose of the property in a commercially reasonable manner. Thus, fair market value is the appropriate valuation. 3 Collier on Bankruptcy ¶ 506.04 at p. 506, 24; *Matter of Cooper*, 7 B.R. 537 (Bkrtcy.N.D.Ga.1980). There is an additional safeguard here because this is an ongoing case. If a commercially reasonable sale by the creditors does not result in payment approximating the values set here, the creditors may ask for reconsideration of their claims. Cf. *In re Crosthwait*, 34 B.R. 469 (Bkrtcy.W.D. Mo.1983).

The Court finds that the land to be surrendered has values as follows:

| To PCA 320 acres | $780 per acre |
|---|---|

To Land Bank

| 1187 acres | $425 per acre |
| 24 acres | $780 per acre |
| 80 acres | $500 per acre |

Both the 1187 acre and 80 acre tracts are adjusted to reflect size and nature of use. The adjustments make little impact on the amount of money necessary for debt service.

### III

Creditors contend that, regardless of the surrender of the land, debtor cannot fund the plan from operations for more than four years at best. But creditors' analysis is based upon the assumptions that all of debtor's calculations are incorrect. They make no calculation based upon the assumption that all of debtor's calculations are correct. That analysis would look, in brief, like this:

| | 1984 |
|---|---|
| Net income | $204,735.00 |
| Plan payments | 102,955.00 |

| | 1985 |
|---|---|
| Beginning balance | $101,780.00 |
| Net income | 118,746.00 |
| Total | $220,526.00 |
| Plan payments | $102,955.00 |

| | 1986 |
|---|---|
| Beginning balance | $117,571.00 |
| Net income | 118,746.00 |
| Total | $236,317.00 |
| Plan payments | $102,955.00 |

| | 1987 |
|---|---|
| Beginning balance | $133,362.00 |

According to the creditors' analysis, debtor would have a negative cash flow at the end of 1987. Debtors analysis demonstrates to the contrary.

The Court does not accept either calculation in its entirety. Already rejected is the land valuation. In addition, the Court finds that there is a dispute as to PCA's interest in the oil rig. PCA denies holding a security interest in the rig. The rig should be removed from those assets to be surrendered to PCA. The parties also dispute some values assigned to personal property to be surrendered. The Court finds the wheat, the generating plant, the portable electric plant, the hay baler and the Davis feed wagon to be worth the value assigned by debtor. PCA's testimony on those items is not credible. For example, it values the wheat in its present state, growing but not harvested. Such a valuation could only be credible if PCA planned to plow the wheat under, which is unlikely. The wheat has to be valued in harvest condition. As another example, debtor's representative testified that the feed wagon was in working condition, while the PCA representative stated that the last time anyone had viewed the

wagon for the creditor was October of 1983. In light of the interest of the parties the Court credits debtor's representative with the more persuasive testimony. The Court does, however, reduce the value of the grain dryer to $10,000. Again, these changes make little impact on debt service.

The amounts spent for annual operations are also in dispute. The Court agrees that the expense projections should include an annual charge for crop insurance. Fuel costs should also be increased, probably to twice what is allocated. The other expense allocations are within reasonable ranges. The Court will credit debtor's representative with persuasive evidence on issues such as soybean spray and other matters of agribusiness discretion.

The aforementioned changes make the debt picture look like this:

| | |
|---|---|
| Land Bank debt | $744,868 |
| PCA debt | 165,936 |
| 1984 expenses | 86,525 |
| 1985 expenses | 70,325 |

Interest and principal payments to Land Bank would be $84,015.90 and to PCA $21,-552.00, resulting in a total debt service of $117,022.90 when other allocations are included. Payments on the secured debt are figured at 13.5% interest.

The calculation for 1984 would be as follows:

| | |
|---|---|
| Net income | $193,735.00 |
| Plan payment | 117,022.10 |
| Balance | $ 76,712.10 |

In 1985 the calculation will look like this:

| | |
|---|---|
| Beginning balance | $ 76,712.10 |
| Net income | 107,246.00 |
| Total | $183,958.10 |
| Plan payment | 117,022.90 |
| Balance | $ 66,935.20 |

In 1986 the calculations will be as follows:

| | |
|---|---|
| Beginning balance | $ 66,935.20 |
| Net income | 107,246.00 |
| Total | $174,281.20 |
| Plan payment | 117,022.90 |
| Beginning balance in 1987 is | $ 57,258.10 |

While these calculations are not as sanguine as those of debtor they are more favorable than those of the creditors. Without changes in prices, costs and interest rates, debtor could last through 1992. In a farm economy such assumptions are not tenable. But in a pared down operation such as will remain upon confirmation, it is more probable that events will favor reorganization rather than work against it. Refinancing is also a distinct possibility. There is, in addition, the prospect of some income from oil exploration or new federal subsidy programs.

Section 1129(a)(11) of the Code provides that a plan may be confirmed if "not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor ..." The word "likely" is not defined in the Code. The Senate Report, No. 95–989, supra, at 128, U.S.Code Cong. & Admin. News 1978, p. 5914, notes that "Paragraph (11) requires a determination regarding feasibility of the plan. It is a slight elaboration of the law that has developed in the application of the word "feasible" in Chapter X of the present Act". The word "feasible" is not defined in the Code or in the Act.

In a reorganization under Chapter X of the Bankruptcy Act, a plan could be confirmed if, inter alia, it was "fair and equitable, and feasible". These questions are addressed to the "informed, independent judgment" of the Court. *National Surety Co. v. Coriell*, 289 U.S. 426, 436, 53 S.Ct. 678, 681, 77 L.Ed. 1300 (1933); *Consolidated Rock Products Co. v. duBois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941). Feasibility is to be determined upon the evidence.

"Findings as to the earning capacity of an enterprise are essential to a determination of the feasibility ... of a plan of reorganization. Whether or not the earnings may reasonably be expected to meet the interest and dividend requirements of the new securities is a sine qua non to a determination of the integrity and practicality of the new capital struc-

ture ... Such criterion is the appropriate one here, since we are dealing with the issue of solvency arising in connection with reorganization plans involving productive properties.... Since its application requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made. But that estimate must be based on an informed judgment which embraces all facts relevant to future earning capacity ..." *Consolidated Rock Products Co. v. duBois,* supra, 312 U.S. at 525–526, 61 S.Ct. at 685.

The rule is followed in this jurisdiction. *Temmer v. Denver Tramway Co.,* 18 F.2d 226 (8th Cir.1927); *In re Landau Boat Co.,* 13 B.R. 788 (Bkrtcy.W.D.Mo.1981).

The Court is obligated to evaluate past earnings to determine if they are "a reliable criterion of future performance" and, if not, to make "an estimate of future performance by inquiring into all foreseeable factors which may affect future prospects. In forming this estimate, 'mathematical certitude' is neither expected nor required". *Protective Com. for Ind. Stock v. Anderson,* 390 U.S. 414, 452, 88 S.Ct. 1157, 1177, 20 L.Ed.2d 1 (1968). See also *In re Waern Bldg. Corporation,* 145 F.2d 584 (7th Cir.1944) where the reorganization would take place over six years and the court found that debtor could fund the plan over that period.

The evidence shows that debtor, like most farmers, borrows for operating purposes. The PCA loan was for operations. The evidence suggests that such loans are rarely paid off but are renewed from year to year so long as the lender is satisfied that the borrower can service the loan. Here the schedules reveal that the debtor borrowed from PCA in March of 1982 and filed for relief in August of 1982. The March borrowing reflected renewal of borrowings began in 1980 with a principal amount then of $749,100. The amount renewed in March of 1982 was $498,957 and new money of $70,798 was advanced. It is apparent that debtor had made substantial payments on the PCA loan. Yet there has been no expectation that the loan would be paid in full on any renewal date, although the note so provides.

The first loan from Land Bank was made in June of 1978 to be repaid in 32 annual installments. The second was made in August of 1979 and was to be repaid in 34 annual installments. Interest is variable. The face amount of the loan was $895,000 with a claimed amount totaling $1,209.014. Although there exists a substantial default, there is no expectation that the debt will be paid in less time than the term of the notes. In addition, this case has progressed on the assumption that Land Bank is oversecured. If the Court accepted Land Bank appraisals it might well be undersecured, resulting in a significant change in debt service requirements.

The point to be drawn from this analysis is that debtor has shown an ability in the past to make substantial payments on long term debt. The analysis of the past shows that the creditors had no expectation of payment in full over a short period of time. The evidence also indicates that debtor is a good operator with substantial cash flow whose problems arose in some part from the refusal of PCA to continue extending credit.

In a farm economy, projections over long periods of time are treacherous. Markets are subject to wide swings. Weather is never predictable. Government programs come and go. The wheat PIK was for one year but may be extended. Other support programs vary only as to amount. Some hazards can be guarded against by, for example, the purchase of crop failure insurance. In this particular case long term loans went into default after only four years.

■ The projections in this case have been refined by experience and the testing of adversary analysis. The Court finds that they are reasonable, and bear a logical relationship to experience. In addition the projections are supported by payments on the secured debt during the administration of the case. The Court holds that the

prediction of feasibility through 1992 is sound based upon past performance and a reasoned analysis of future operations. The Court holds that a prediction beyond that point cannot be made with any degree of certainty and that the statutory standard does not require guesswork. As to Land Bank and PCA, the plan is feasible, not likely to be followed by liquidation or further financial reorganization, and may be confirmed over their objections.

The Court notes that the class of unsecured creditors has also rejected the plan. The plan proposes to pay them in full. It is unlikely that they would receive anything in liquidation. Under the provisions of Section 1129(b)(2)(B) of the Code, a plan may be confirmed over the objection of unsecured creditors if they "receive ... property of a value, as of the effective date of the plan, equal to the allowed amount of such claim" or the junior class, here the partners, "receive or retain" no property.

The partners are retaining their interest in the property. Therefore the unsecured creditors must be paid in full, with interest, if the payments are deferred. Cf. *In re W.E. Parks Lumber Co., Inc.*, 19 B.R. 285 (Bkrtcy.W.D.La.1982). Interest at 12% is appropriate. It is slightly more than prime rate at this time. The amount of unsecured debt is small, about $35,000, and the payment of interest will not hinder reorganization. The plan will be confirmed as to unsecured creditors conditioned upon debtor amending the plan to provide for the payment of interest, such amendment to be filed no later than thirty (30) days from the date of this Order. Debtor is also to prepare a schedule of payments.

The debtor's plan filed on the 16th day of January, 1984, having been distributed to creditors and it having been determined after hearing on notice:

1. That the plan has been accepted in writing by the creditors whose acceptance is required by law; specifically two classes are unimpaired, deemed to have accepted and not affirmatively rejected and one class has affirmatively accepted; and

2. That the plan has been proposed and its acceptance procured in good faith and not by any means, promises, or acts forbidden by law; that the provisions of Section 1129 of the Code have been complied with; and that the debtor has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to the discharge of a debtor, it is, therefore

ORDERED that the debtor's Plan filed on the 16th day of January, 1984, be CONFIRMED. Debtor is to begin operations under its confirmed plan on April 9, 1984. Debtor's Motion for Use of Cash Collateral is, therefore, MOOT.

ORDERED further that the above-named debtor is released from all dischargeable debts unless excepted under Section 523 of the Code and unless the subject of any action pending before this Court which has not been determined, and

ORDERED further that any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of debtor, and

ORDERED further that all creditors whose debts are discharged by this Order are enjoined from instituting or continuing any action or employing any process to collect such debts as personal liabilities of the above-named debtor.