### In re WALAT FARMS, INC., Debtor.

**Bankruptcy No. 85–09344.**

United States Bankruptcy Court, E.D. Michigan, N.D.

Feb. 9, 1987.

See also, Bkrtcy., 69 B.R. 529.

Ralph I. Selby and Randall L. Frank, Bay City, Mich., for debtor.

Lambert, Leser, Dahm, Giunta, Cook & Schmidt, P.C., Bay City, Mich., for Equitable Life Assurance Society.

## MEMORANDUM OPINION REGARDING CONFIRMATION OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

ARTHUR J. SPECTOR, Bankruptcy Judge.

The issue is whether the Court should allow the debtor to cramdown its plan of reorganization on the first mortgagee of a substantial part of its farmland when the plan provides that only a certain part of the mortgaged premises be deeded to the mortgagee in full satisfaction of the entire mortgage indebtedness.

Walat Farms, Inc. (the debtor) is a family farm corporation consisting of approximately 1800 acres of farmland and other non-real estate assets, including crops and farm machinery. The debtor is indebted to Equitable Life Assurance Society ("Equitable") in the approximate amount of $589,000, which debt is secured by a first mortgage on approximately 760 acres. NewCentury Bank holds a first mortgage on 160 acres of other land and a lien on farm machinery as security for the obligation the debtor owes it of approximately $741,000. Early in the case, a hearing on valuation of substantially all of the estate's assets was conducted in which all parties in interest were invited to participate. The Court valued the land subject to Equitable's mortgage at over $1,100,000.00 ($1,748 per tillable acre).[1] We valued the 160 acres subject to NewCentury Bank's first mortgage at $240,000 ($1,500 per acre) and the machinery subject to the bank's security interest at $200,000. Accordingly, Equitable was deemed fully secured, while NewCentury Bank was apparently undersecured to the tune of about $301,000 (see order entered April 18, 1986). Thereafter, NewCentury Bank entered into an agreement to finance the debtor's 1986 farming operations. In return for a line of credit, the debtor in possession, with the Court's approval, granted the bank a lien on all of the estate's assets subject to all pre-existing liens. This gave the bank a second mortgage on the 760 acres of farmland upon which Equitable has its first mortgage. On July 22, 1986, the debtor filed its plan of reorganization, which was subsequently modified on September 15, 1986 in a manner not material to the issue at bench.

The pertinent portions of the plan, to which Equitable has expressed continuing and vociferous objection are as follows.

[1] The uncontested appraisal testimony at that hearing was that there were approximately 632 tillable acres. Although no specific testimony was received as to the value of the approximately 128 non-tillable acres, at a later hearing that appraiser agreed that such acres are valued at $350 each. Thus, the land upon which Equitable held a first mortgage was worth, we feel, approximately $1,151,000 in December, 1985.

The debtor would convey to Equitable 400 acres (or more, depending upon the Court's determination of the per acre value) of the parcel in question, which would constitute the equivalent of the secured debt held by Equitable; as a consequence, Equitable would, upon tender of the deed, be obliged to discharge its mortgage of record as to the remainder of the property encumbered thereby. An incidental result of this transaction is that NewCentury Bank's second mortgage lien on the remaining acres would then become a first lien. Then the debtor would deed this acreage to NewCentury Bank in satisfaction of the bank's secured claim. NewCentury Bank not only supports the plan, it seemed at trial to be its co-proponent.

Although the debtor originally stated that by virtue of this treatment Equitable was not impaired as that term is used in 11 U.S.C. § 1124, at the hearing on confirmation it conceded its error and now agrees that Equitable's claim is impaired. Since Equitable, a creditor in its own class, rejected the plan, the plan cannot be confirmed unless it may be crammed down on Equitable pursuant to § 1129(b). This section states in pertinent part:

(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

Equitable's objection is that the plan fails the "fair and equitable" test of § 1129(b)(2).

First, it argues that by giving a junior secured creditor, NewCentury Bank, a deed representing fee ownership of 360 acres of land free and clear of Equitable's present first mortgage, the plan turns the priority rules upside down. The proponents' response is that Equitable too will be receiving a free and clear deed to 400 or more acres to fully satisfy its claim.

Second, Equitable claims that the conveyance to NewCentury Bank is objectionable because it puts the first mortgagee into a competition with the second mortgagee in the sale of the farmland; with so much land for sale in the same area, Equitable's chances of selling its acres at a fair price are thereby reduced. Furthermore, if it turns out that the land cannot be sold for the value determined by the Court at the hearing on confirmation of the plan, Equitable would lack recourse to sell the rest of the land upon which it formerly held a mortgage because it would by then be owned by or disposed of by NewCentury Bank. The proponents argue that by being conservative in valuing the land, no error

prejudicial to Equitable will occur, and so we need not address the results of such a hypothetical error.

Third, Equitable objects that the plan has not provided any of the elements for cramdown with respect to its class. The plan, it points out, does not propose

> (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property (11 U.S.C. § 1129(b)(2)(A)(i));

does not provide

> for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph (11 U.S.C. § 1129(b)(2)(A)(ii));

and does not provide

> for the realization by such holders of the indubitable equivalent of such claims. (11 U.S.C. § 1129(b)(2)(A)(iii)).

The proponents concede that since the plan does not provide for deferred cash payments to Equitable, subparagraph (i) is not satisfied; and that since the sale of the land is not contemplated, subparagraph (ii) is not satisfied. They argue, however, that the plan does indeed provide Equitable with "the indubitable equivalent of" its claim.

We must agree that if the land being conveyed under the plan to Equitable is worth the amount of its claim, that the indubitable equivalent test is met and that the other objections raised would lack merit. The problem arises in determining whether the land offered is worth the amount of the claim. This is really more a practical than a theoretical problem.[2] And the cause of the problem is the debate inherent in establishing a value for real estate. Two hypothetical examples show why this problem is unlikely to arise except when the asset in question is something as illiquid as real estate.

Hypothetical # 1: The debtor is in the oil business and owns 100,000 barrels of a particular grade of oil worth on the open market $18 per barrel. The oil is encumbered by a first lien held by Creditor to secure its claim of $450,000. The plan provides that the debtor will, upon entry of the order confirming the plan, deliver 25,000 barrels of the oil to Creditor. Ignoring any delay incidental to the entry of the order and costs of transportation, etc., because oil is sold on a recognized commodities market, it is clear that such a plan does indeed provide for the realization by Creditor of the indubitable equivalent of its claim, and therefore should be confirmed even over Creditor's objection. This hypothetical fits as well with any other fungi-

---

2. On December 9, 1985, Donald C. Johnson, an MAI certified real estate appraiser called by NewCentury Bank, testified that in his opinion, the value of most of the debtor's farmland was $1,748 per tillable acre. When he was called again to testify at the confirmation hearing, he stated that the value of the parcel of land in question was $1,607 per acre without differentiating between tillable and non-tillable land and therefore presumably averaging them together, for a total value of $1,222,000. Thomas P. Williams, an MAI certified appraiser called by Equitable at the confirmation hearing gave his opinion that the 623 tillable acres (he felt only 623, not 632 acres were tillable) in the parcel were worth $855,400 ($1,373 per acre) and that the 137 non-tillable acres were worth $47,950 ($350 per acre), for a total value for the parcel of $900,000 ($987 per acre) on a market approach; but only $490,000 via an income approach; and, reconciling the two, he determined that the parcel had a fair value of $750,000. Ralph Frahm, an agricultural loan senior review real estate appraiser employed by the bank testified that, in his opinion, the 623 tillable acres were worth $1,588 per acre, the 137 non-tillable acres were worth $350 per acre, and a $150,000 credit should be added for the value of the dikes on the premises, for a total value of $1,187,000. The range of opinion, therefore, is between $750,000 and $1,222,000.

ble, commodity-type asset, such as grain, lumber, orange juice, etc.

Hypothetical # 2: The debtor is a jewelry merchant (or automobile dealership). Within accepted ranges, the value of the diamonds or gold or other jewelry and gems may be agreed upon by experts. Likewise with new cars. A debtor with 100 new Cadillac Sevilles in inventory will probably have little difficulty in getting a consensus on a value per car of, say, $18,000. An objection by a creditor holding a lien on this inventory can be bought off by a decrease in the assigned value of the inventory, and a corresponding increase in the quantity surrendered. Or, if the creditor is obstinate and if the Court has *no doubt* that the value of the property being transferred to the lienholder is the equivalent of its claim, it could order the confirmation of the plan notwithstanding the creditor's objection.

We believe that a bankruptcy court is permitted, indeed required, to make these determinations on a case by case basis and to order confirmation of a plan which indubitably protects and pays the claim of an objecting creditor. *In re Briggs Transportation Co.,* 780 F.2d 1339, 1346 (8th Cir. 1985), 2 *Collier on Bankruptcy,* ¶ 361.01(4) (15th ed. 1985). Section 1129(b) recognizes that it is not equitable for a court to allow one unreasonable creditor to obstruct a plan of reorganization agreed to by the others when it is clear that the plan will do it no harm. *In re Hollanger,* 15 B.R. 35, 48, 8 B.C.D. 365, 5 C.B.C.2d 386 (Bankr.W. D.La.1981).

As stated, the determination of whether a particular plan provides for the realization by the rejecting class of the indubitable equivalent of its members' claims presents a practical problem only. The reason why cases cannot be found which hold in circumstances like the first hypothetical that such a plan may be confirmed is simply that such plans are not proposed. This is because there is no need to propose a plan which would turn over a portion of a fungible asset to a lienholder in return for a release of lien on the balance of the asset. All the plan need propose is the immediate market sale of the asset and payment of the lienholder's claim in cash, thereby rendering the claim unimpaired. 11 U.S.C. § 1124. There is therefore no need to go through all the rigmarole that an asset partial surrender plan would entail.

Although the second hypothetical presents a practical problem similar in nature to that which we face here, it is far less severe. In such cases, the process of plan negotiation likely weeds out many incipient disputes. Those cases, if any, that have required a judicial decision on say, the value of the automobiles being turned back to an objecting class of secured creditors, have not been cited to us.

As has been recognized in other areas of law and at all times in history, real estate is a unique commodity. A purchaser of land may forswear damages and have a court compel conveyance of land by a breaching seller; and *vice versa.* Why? Because the value of land is difficult (some say "impossible") to fix. 71 Am.Jur.2d *Specific Performance,* § 112 (1973).

Similarly, we concede to doubts about our ability to fix the "value" of the land in question. We need not make a pronouncement that no plan proposing the surrender of a portion of mortgaged land to a mortgagee in return for a compelled release of the lien on the remainder of the property will ever be confirmed. Suffice it to say, however, that no matter how hot[3] the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of Equitable's claim. "Indubitable" means "too evident to be doubted". *Webster's Ninth New Collegiate Dictionary* (1985). We profess doubt on the facts of this case.

---

**3.** The term "hot" denotes rapid sales—i.e., quick turnover—at close to, or better than, the asking price.

Lest the proponents take this last statement to mean that we doubt that the land is worth the $1,600 per acre they propose, but that through a process of "negotiation" with the Court an appropriate figure can be "arrived at", we further hold that on the facts here we can profess no greater certainty as to the value of such land than Equitable itself. Therefore, if Equitable is not satisfied by an increase in the number of acres offered, we will be unwilling to force it to take it in return for a release of its lien on the remainder of the land. Moreover, by such a process, a point is likely to come where the proponents would do violence to the "fair and equitable" standard by paying Equitable more than its claim, *see In re Elijah*, 41 B.R. 348, 352 (Bankr.W.D.Mo.1984); 5 *Collier on Bankruptcy*, ¶ 1129.03[4](g) (15th ed. 1985), K. Klee, "All You Ever Wanted to Know About Cramdown Under the New Bankruptcy Code", 53 Am.Bankr.L.J. 133, 142 (1979), which is likely to engender objections elsewhere.[4]

The proponents have directed us to *In re Fursman Ranch*, 38 B.R. 907, 11 B.C.D. 985 (Bankr.W.D.Mo.1984), wherein a plan was confirmed which provided that the debtor would convey to the Federal Land Bank and to the local Production Credit Association a portion of the real property on which these creditors held security interests and would pay for the remainder over time, with interest, while the liens thereon would be retained. The plan called for credit to be given to the debtor for the value of the land being surrendered to these creditors, to which proposal these creditors objected.[5] We agree with the result in *Fursman Ranch*, yet it is distinguishable. The result was that the plan was confirmed, BUT "the creditors [could] ask for reconsideration of their claims", if a commercially reasonable sale resulted in proceeds less than the amount of their claims. *Id.*, 38 B.R. at 910. Although not explicit in the opinion, we take this to mean that if the land did not bring the amount the debtor and the court predicted that it would, these creditors' secured claims on the remainder of the land retained by the debtor would be augmented by the deficiency. *Elijah*, 41 B.R. at 351. Since these creditors held mortgages on such retained lands, the plan did no violence to their interests.

The proponents could have, but inexplicably did not cite the case of *In re Sun Country Development, Inc.*, 764 F.2d 406 (5th Cir.1985), wherein the confirmation of a plan much like the proponents' plan here was upheld over the objection of the first mortgagee. B.M. Brite had sold the debtor approximately 500 acres of land, retaining a first mortgage on 200 acres thereof. The debtor owed Brite $153,520 at the time it filed its Chapter 11 petition. The debtor's plan proposed that the debtor give Brite 21 specified notes secured by trust deeds on 21 lots out of the 200 acres, whose makers were purchasers of these 21 lots from the debtor as full payment of Brite's claim; thus requiring Brite to release his lien on the 200 acres.[6] Brite objected and argued

---

4. If the proponents and Equitable are able to arrive at a figure which would provide Equitable with a sufficiently comfortable equity cushion, without modifying the current plan's provision for 100% payment of non-insider unsecured claims, (presumably with the blessings of the debtor's stockholders and those members of the Walat family holding subordinate unsecured claims), there would be no one to object to possibly paying Equitable more than in full, and so such a hypothetically objectionable scenario would present no impediment to confirmation.

5. Although the court described this plan as not proposing a sale of any of the land, we respectfully disagree. We believe the *Fursman Ranch* plan, as does the one here, involved a sale of the land being "conveyed" to the creditors; indeed, it was more than (read as "worse than") a sale; it was a forced purchase, with none of the protections of a real § 363 sale.

6. From the file in the district court, # DR–83–CA–42 (E.D.Tex.) we learned that the 21 parcels comprised only 105 acres. From the counsel involved in the case we learned that the contracts for deed on lots comprising 50 acres had already been paid off, thus leaving the debtor with 45 acres free and clear of Brite's lien. The plan's goal was to use the 45 acres to obtain the financing necessary to put roads into the subdivision as had been promised the purchasers of the lots and to save them from losing their

that such a plan could not be crammed down on him because the package of 21 notes from the 21 obligors was not the indubitable equivalent of his first lien on the entire 200 acres. The Court of Appeals affirmed the bankruptcy court's finding of fact that the present value of the 21 notes was $153,777, over $200 more than Brite's secured claim, and its confirmation of the plan.

The Court of Appeals did not discuss much law, and gave very little rationale for its holding. It appears, therefore, that the court felt the issue was strictly one of fact. The decision of the trier of fact, of course, is difficult to overturn on appeal. This comports with our own view of the issue: no legal impediment stands in the way of confirmation of such a plan; merely the factual question of doubt as to value and overall fairness of the proposal. We have made the finding that we have doubt; therefore, the proposal does not provide the *indubitable* equivalent of Equitable's claim.

*In re Wieberg,* 31 B.R. 782 (Bankr.E.D. Mo.1983) likewise found no conceptual difficulty in a Chapter 11 plan which proposed the paying of a secured claim with a surrender of some of the encumbered land together with cash and other unencumbered real property. However, there the

court found as a fact that the proposal did not provide the objecting secured creditor with the indubitable equivalent of its secured claim because of the unreasonably high valuation the debtor placed on the land being surrendered.

Our doubts are of the same order as those held by the same judge who decided *Fursman Ranch.* In *In re Elijah,* Judge Pelofsky held that a plan which would have taken away a first mortgage position on Blackacre held by creditor Smith and given him a replacement (apparently third) mortgage interest on Whiteacre, which was to be sold to pay the claims of the lienholders, was "neither fair nor equitable". *Id.* at 352. Underlying the legalese was the thought that although "[t]heoretically, such a proposal could be confirmed because the sale of the surrendered property will produce sufficient proceeds to pay all of the lienholders.... [t]here is, of course, no guarantee of such a result." The court worried that Smith, who held a small claim, might, in order to protect his secured position in Blackacre, be forced to spend substantial sums of money to buy out the senior lienholders. Likewise here, there is no guarantee that Equitable's eventual sale of the surrendered acres will produce sufficient proceeds to pay its claim.[7] And, in such an event, there would be no way at all

---

interests as a result of Brite's plan to foreclose on the entire 200 acre parcel.

**7.** The subsequent history of *Sun Country Development, Inc.,* 764 F.2d 406, 409 (5th Cir.1985) supports our fears. The Court of Appeals' opinion stated:

Brite first complains that the notes are inferior to the first lien he had on the 200 acres in that present value of the notes is worth only fifty percent of its lien and barely exceeds the amount of the debt. Brite then complains that the present value calculation is incorrect because it fails to take into account the possibility of the debtors on the notes defaulting, the debtors' histories of failing to keep their payments current. Brite also argues that the value the bankruptcy court placed on the lots securing the notes was too high. Brite finally complains that in the event of default, he will be forced to bring twenty-one, rather than one, foreclosure actions at a much greater expense.

To the extent that Brite attacks the findings of the bankruptcy court, we reject his complaints, as the findings were supported by the evidence. We further believe that Brite's other concerns do not render the twenty-one notes dubitable equivalent of the original first lien. As reflected by the district court record, since Brite has taken over collection of the notes, the debtors have generally kept their payments on notes current. Furthermore, if debtors do default on their notes, the value of the land securing the notes, [$287,500] as found by the bankruptcy court, appears sufficient to cover the additional expense of foreclosing on twenty-one separate properties.

According to the parties' counsel, the debtor has still, more than 3 years since confirmation, not put in the roads; nine of the 21 trust deeds have had to be separately foreclosed and the value of the property now is significantly less than the amount "determined" by the court.

for it to protect its concededly fully secured claim.[8]

Equitable conceded for purpose of argument that a plan like the one in *Fursman Ranch* would not be objectionable precisely because its lien on the acres being conveyed to NewCentury Bank would be retained in case the land did not bring the price we might forecast. The proponents do not wish to present such a plan. Likewise, Equitable has conceded that a plan proposing the outright market sale of the land (in parcels, if the debtor wishes) until the Equitable lien is satisfied, is confirmable. This, too, is not what is proposed. We agree with Equitable that lacking both of these provisions, the plan is not fair and equitable to it and so may not be confirmed. An order denying confirmation of the amended plan will be entered contemporaneously herewith.

---

**8.** We have not bothered to calculate how large Equitable's claim might eventually be by the time the property is sold. Since it is likely that it could take more than a year—(NewCentury's own appraisers speculated that it would take between one and two years to sell it at a fair value; testimony of Ralph Frahm, September 8, 1986; testimony of Donald Johnson, December 9, 1985)—to properly market this land, its secured claim, which accrues interest at approximately $132 per day, and which might include a realtor's commission of from 5%–10%, and carrying costs such as property taxes (less rental income perhaps), might then exceed $670,000. Furthermore, since we are in a deflationary market environment, the longer it takes to sell the property, the less likely it is that the surrender of the land will be the equivalent of the claim.