**In the Matter of Michael George MAY, Debra Ann Pace May, Debtors.**

**Bankruptcy No. 93–41430.**

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Aug. 30, 1994.

Jo C. Dearing and Dennis J. Connolly, Atlanta, GA, for plaintiff/movant.

C. James McCallar, Jr., Savannah, GA, for defendant/respondent.

### MEMORANDUM AND ORDER ON OBJECTION TO CONFIRMATION

LAMAR W. DAVIS, Jr., Chief Judge.

This matter comes before the Court on the objection of California Federal Bank, FSB ("California Federal") to confirmation of Debtors' Chapter 11 Plan of Reorganization. A hearing to consider confirmation of the plan was held on June 9, 1994. Based upon the evidence adduced at that hearing, the briefs submitted by both parties, and applicable authorities, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

On August 24, 1993, Debtors in the above-captioned case filed a petition under Chapter 11 of the Bankruptcy Code. Debtors remain in possession of the bankruptcy estate as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code.

California Federal holds a balloon note, dated October 16, 1991, which Debtors executed in its favor in the original principal amount of $600,000.00. The note is secured by a security deed, dated October 16, 1991, that was duly recorded with the Clerk of the Superior Court of Chatham County, Georgia, on October 17, 1991. The deed grants California Federal a first priority security interest in eighteen duplex units located at 1401 King George Boulevard, Chatham County, Georgia, and known as Hunters Green Townhomes ("Hunters Green"). As of the date of the hearing on this matter, Debtors owned only fourteen units at the Hunters Green property, four units having been sold prior to, and during, the pendency of the bankruptcy. Another unit was under contract to be sold as of the date of the confirmation hearing.

Debtors filed their Restated Chapter 11 Plan on April 21, 1994. The Plan places California Federal's secured claim alone in Class 4 and provides for the following treatment of the claim:

[California Federal] shall be paid the balance due on its claim as of the confirmation date by the transfer to it of title and possession to a whole number of units in Hunters Green Townhomes at a $52,500.00 per unit value. This creditor has the right to select the individual units to satisfy its debt and these units will, at the option of this creditor, either (1) be deeded to this creditor by debtor in lieu of foreclosure; or (2) be selected and foreclosed upon by non-judicial foreclosure under Georgia law and the terms of this creditor's deed to secure debt. The number of units chosen by this creditor shall be the lowest whole number which at least equals: 1. This creditor's debt on the date of confirmation, plus; 2. an amount equal to any other liens on the corresponding units as of the date of confirmation which would, under the laws of the State of Georgia, be the legal responsibility of this creditor following a Georgia non-judicial foreclosure. If this Class 4 creditor does not make a selection of units and/or a choice of means by which to receive title to its units by not later than five days after the date of confirmation, the Debtors shall have the right promptly thereafter to make a written election of the units on which this creditor will be deemed to have elected to foreclose.

Restated Chapter 11 Plan, ¶ 4 of Article II. Thus, Debtors' plan is a so-called "eat-dirt" or "debt-for-dirt" plan in which they propose to surrender a number of the Hunters Green units, at a value of $52,500.00 per unit, that is approximately equal to their indebtedness to California Federal. The parties have stipulated that the balance of the debt secured by the Hunters Green property as of June 9, 1994, is $573,507.32. Under the Plan, therefore, Debtors would surrender 11 units (11 × $52,500.00 = $577,500.00) to California Federal in complete satisfaction of its claim and retain the remaining units free and clear of California Federal's interest under its security deed.

California Federal voted to reject the Plan and filed an objection to Confirmation. California Federal was the only creditor that voted to reject the Plan. However, because California Federal's claim is impaired and is the only claim within its class under Debtors' Plan, the Plan does not satisfy section 1129(a)(8) of the Code and cannot, therefore,

be confirmed under section 1129(a). Anticipating California Federal's vote, Debtors filed a motion seeking confirmation of their Plan over California Federal's rejection under the so-called "cram-down" provisions of section 1129(b)(1) of the Code. Debtors contend that, consistent with the requirements of section 1129(b)(1), their Plan does not "discriminate unfairly" and is "fair and equitable" with respect to California Federal's claim because the surrender of the eleven Hunters Green units will provide California Federal with the "indubitable equivalent" of its secured claim as provided in section 1129(b)(2)(A)(iii) of the Code. Therefore, according to Debtors, their Plan should be confirmed despite California Federal's vote to reject the Plan.

California Federal, on the other hand, asserts in its objection that the Plan should not be confirmed under section 1129(b)(1) because the Plan does not treat its claim in a "fair and equitable" manner. In support of this assertion, California Federal contends that the Plan's proposal to surrender fewer than all of the units, at the unreasonably high valuation of $52,500.00 per unit, fails to provide it with the "indubitable equivalent" of its claim.

Because California Federal objected to the value Debtors placed upon the Hunters Green units in their Plan, the court heard expert testimony on the issue of valuation at the confirmation hearing. The parties' appraisers generally agreed that $52,500.00 is an appropriate current "retail" price for any given unit within the Hunters Green development. That is, any single unit sold to an individual purchaser should bring a price of at least $52,500.00. California Federal's appraiser, however, also testified as to what an investor would pay if he were purchasing all fourteen units together in a single package. This valuation took into account the holding costs that such an investor would incur in holding and marketing the properties for a period of time before all of the units were sold. Accordingly, he concluded that the total discounted present value of all fourteen units is $627,223.00. Debtor's appraiser made no such calculation.

Because California Federal is required to take delivery of multiple units under Debtors' Plan, it argued that the discounted value of $627,223.00 is the appropriate value in evaluating the propriety of Debtors' Plan. Clearly, Debtors' proposal places California Federal in a position similar to that of an investor purchasing all of the units (an involuntary one at that). As a result, it shifts the burden of selling the units, and therefore the risk of loss or gain, to California Federal. For these reasons, I announced at the hearing that I would adopt $627,223.00 as the appropriate value for purposes of the proposal in Debtors' Plan.[1] This valuation implies a present-day per unit value of $44,801.64.

## CONCLUSIONS OF LAW

◼ As previously alluded to, Debtors' Plan cannot be confirmed unless it can be "crammed down" upon California Federal pursuant to section 1129(b)(1) of the Bankruptcy Code. This provision mandates that a court confirm a plan, notwithstanding the fact that it does not satisfy section 1129(a)(8), if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims that is impaired and has not accepted the plan.[2] Section 1129(b)(2)(A) sets forth the minimum requirements for a plan to be considered "fair and equitable" with respect to a class of secured claims, and it provides that a secured claimant must either (1) retain its lien and get paid the full amount of its claim in deferred cash payments which have a present value equal to the value of the claimant's collateral; (2) be paid from the sale of its collateral; or (3) realize the "indubitable equivalent" of its

---

1. See 11 U.S.C. § 506(a); *In re Simons*, 113 B.R. 942, 947 (Bankr.W.D.Tex.1990); *Matter of Martindale*, 125 B.R. 32, 36 (Bankr.D.Idaho 1991).

2. In full, 11 U.S.C. § 1129(b)(1) provides:
 Notwithstanding section 510(a) of this title, if all applicable requirements of section (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan.

claim. 11 U.S.C. §§ 1129(b)(2)(A)(i), (ii), and (iii);[3] *Matter of Martindale*, 125 B.R. 32, 37–38 (Bankr.D.Idaho 1991). Thus, in order for a debtor's plan to be considered "fair and equitable" with respect to a non-consenting class of impaired secured claims, the plan must, at a minimum, treat that class of creditors in a manner that is consistent with one or more of the three provisions contained in section 1129(b)(2)(A).

■ Here, Debtors contend that California Federal will, consistent with section 1129(b)(2)(A)(iii), realize the "indubitable equivalent" of its secured claim under the Plan's proposal to surrender a number of Hunters Green units equal in value to the amount of California Federal's claim. The version of Debtors' Plan currently on file with the Court, however, is premised upon a per unit value for the Hunters Green units of $52,500.00. Thus, given the court's valuation of $44,801.64 per unit, the Plan currently on file clearly does not provide California Federal with the "indubitable equivalent" of its claim, and, therefore, cannot be confirmed over its objection.

■ Nevertheless, California Federal remains oversecured under the court's valuation by $53,715.68 ($627,223.00 total value versus a debt of $573,507.32). *See* 11 U.S.C. § 506(a). Thus, following the logic of Debtors' current Plan, Debtors would need to surrender thirteen of the fourteen units (13 × $44,801.64 = $582,421.32) to fully satisfy their debt of $573,507.32 to California Federal. Such a transfer would provide California Federal with an equity cushion of approximately 1.5%. Debtors indicated at the hearing that they wished the opportunity to amend their Plan to bring it into conformance with the court's valuation of the Hunters Green units. To date, however, Debtors have not amended their Plan, and it appears from Debtors' brief that they did not understand that the court's announcement of value at the hearing was a final ruling on the issue. Accordingly, Debtors will be given twenty (20) days from the entry of this order to amend their Plan to bring it into conformance with the court's valuation of Hunters Green at $627,223.00, unless they intend to appeal said ruling.

■ Such an amendment would not resolve California Federal's objection to confirmation of the Plan, however. Counsel for California Federal argued at the hearing and subsequently on brief that surrender of less than all of the units, even under the valuation adopted by the court, does not provide it with the "indubitable equivalent" of its claim because such a proposal effectively strips it of its lien and deprives it of its rights under state law. Because this issue has been joined, and in the interest of judicial economy and expediency, the court takes this opportunity to resolve the issue of whether the surrender of thirteen of the fourteen Hunters Green units provides California Federal with the "indubitable equivalent" of its claim as required for Debtor's Plan to be considered "fair and equitable" under section 1129(b)(2)(A).

In *Matter of Charles W. Hock, Jr.*, 169 B.R. 236 (Bankr.S.D.Ga.1994), this court recently confronted the closely-related issue of whether a proposal to surrender all of an undersecured creditor's collateral in satisfaction of its secured claim provides the creditor

---

**3.** In full, section 1129(b)(2)(A) provides:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payment totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

with the "indubitable equivalent" of its claim. The debtor in that case proposed to surrender all of an undersecured creditor's collateral (a parcel of real property) to the creditor in full satisfaction of the creditor's secured claim and pay the unsecured portion of the claim in the same manner as all other unsecured creditors. The creditor voted to reject the plan and objected to confirmation, arguing that it should be entitled to foreclose upon the property and thereafter file a claim based upon the actual deficiency in foreclosure. The debtor, on the other hand, contended that his Chapter 11 plan should be crammed down upon the creditor because the plan provided the creditor with the "indubitable equivalent" of its secured claim, as required under section 1129(b)(2)(A)(iii).

Relying upon the Fifth Circuit's decision in *Matter of Sandy Ridge Development Corp.,* 881 F.2d 1346, 1350 (5th Cir.1989), *reh'g denied,* 889 F.2d 663 (5th Cir.1989), I held that the proposal in the debtor's plan satisfied the "fair and equitable" requirement of section 1129(b)(1) because it provided the creditor with the "indubitable equivalent" of its secured claim. *Hock, supra,* 169 B.R. at 239. "[W]here the property value has not fundamentally changed following entry of a final order setting value and where Debtor's proposed use has not changed, a debtor's abandonment of the property to the secured creditor in full satisfaction of its secured claim, as determined by the court under 11 U.S.C. § 506(a), is sufficient to provide that creditor with the 'indubitable equivalent' of its secured claim as required under 11 U.S.C. § 1129(b)(2)(A)." *Id.* at 239. *Accord In re Leroy Moore, d/b/a Moore Homes,* Ch. 11 No. 88–40105, slip op. at 10–11 (Bankr. S.D.Ga. May 31, 1990) (Dalis, B.J.) ("Distribution of estate property, at values properly fixed by the bankruptcy court, to nonconsenting creditors under a liquidating plan satisfies the 'indubitable equivalent' provision of 11 U.S.C. § 1129(b)(2)(A)(iii).").

 Thus, having previously concluded that the surrender of all of an undersecured creditor's collateral provides that creditor with the "indubitable equivalent" of the secured portion of its claim under section 1129(b)(2)(A)(iii), the question in this case is

whether this principle is properly extended to a proposal to surrender only a portion of the collateral to an oversecured creditor in full satisfaction of its claim. For the reasons that follow, I conclude that such a proposal can provide an oversecured creditor with the "indubitable equivalent" of its claim.

The concept of indubitable equivalence in section 1129(b)(2)(A)(iii) is derived from Judge Learned Hand's decision in *In re Murel Holding Corp.,* 75 F.2d 941 (2nd Cir. 1935). In *Murel,* the Court was faced with a proposal to pay, under a plan of reorganization, a second-mortgage holder ahead of the first-mortgage holder to the extent of some $11,000.00 in interim financing that the second-mortgage holder agreed to provide to the debtors. The debtors contended that the plan satisfied the catch-all provision of the reorganization statute then in effect, which required a plan to "provide adequate protection for the realization by ... the dissenting class ... of the full value of their interest, claims or liens." *Id.* at 942. The first-mortgage holder, on the other hand, contended that debtors' proposal did not adequately protect its interest and it was, as a result, entitled to relief from stay.

The Court, characterizing the provision as "vague", noted that it had to be construed in a manner that was not violative of first-mortgage holder's constitutional protections. *Id.* Accordingly, the Court concluded that debtor's proposal did not satisfy this provision, reasoning as follows:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most *indubitable equivalence.*

*Id.* (emphasis added).

 The Supreme Court has since amplified that Judge Hand "used the words 'indu-

bitable equivalence' with specific reference not to interest (which was assured), but to the jeopardized principal of the loan ..." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 378, 108 S.Ct. 626, 634, 98 L.Ed.2d 740 (1988). *See also In re American Mariner Indus., Inc.*, 734 F.2d 426, 433 (9th Cir.1984). Nevertheless, a secured creditor's right in this regard extends only to the protection of its interest in the collateral securing the debt owed to it. "A security interest is—a security interest. It is not fee simple." *Matter of James Wilson Assoc.*, 965 F.2d 160, 171 (7th Cir.1992). Moreover, an oversecured creditor "has no right to fence off the entire collateral in which it has an interest so that no other creditor can get at it. Its only entitlement is to the adequate protection of its interest ... There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected ..." *Id.*

Thus, courts construing the "indubitable equivalent" standard in section 1129(b)(2)(A)(iii) have focused upon the risks imposed upon a secured creditor in having its collateral altered or substituted. "[T]o the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure. Therefore, 'if a reorganization plan proposes to satisfy an allowed secured claim with anything other than the secured creditor's collateral, a court must examine (1) whether the substituted collateral is completely compensatory and (2) the likelihood that the secured creditor will be paid.'" *In re Keller*, 157 B.R. 680, 683–84 (Bankr. E.D.Wash.1993) (*quoting in part In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 529

(S.D.Tex.1990)). *See also Matter of Sun Country Development, Inc.*, 764 F.2d 406, 409 (5th Cir.1985). In applying this standard, these courts have concluded that a proposal to exchange promissory notes secured by deeds of trust for a creditor's release of its deed of trust against real estate,[4] to give securities in lieu of cash,[5] and to exchange an annuity contract for the release of a creditor's security interest in real property[6] may satisfy the "indubitable equivalent" standard of section 1129(b)(2)(A)(iii).

■ These decisions make clear that a debtor may substantively alter the rights that a secured creditor otherwise enjoys in its collateral under state law, as long as that creditor receives the "indubitable equivalent" of its secured claim. "[T]he principle that liens pass through bankruptcy unaffected cannot be taken literally, ... and it is the law that, provided the plan of reorganization gives the secured creditor the 'indubitable equivalent' of its secured interest, the bankruptcy judge can force the creditor to accept the exchange." *Matter of James Wilson Assoc.*, 965 F.2d at 171.

Not surprisingly, then, the one court that has dealt with a plan proposal similar to the one in the instant case recognized that, at least in theory, a partial surrender of collateral to an oversecured creditor in full satisfaction of the creditor's claim could provide that creditor with the "indubitable equivalent" of its claim. *In re Walat Farms, Inc.*, 70 B.R. 330, 333 (Bankr.E.D.Mich.1987).[7] As a practical matter, however, the court was unwilling to find that the specific proposal before it actually provided the creditor with the indubitable equivalent of its claim. *Id.*

The debtor in *Walat Farms* was a family-farm corporation that owned approximately 760 acres of farmland. The land, valued by

4. *See Matter of Sun Country Development, Inc.*, 764 F.2d 406, 409 (5th Cir.1985).

5. *See In re San Felipe @ Voss, Ltd.*, 115 B.R. 526, 531 (S.D.Tex.1990).

6. *See In re Keller*, 157 B.R. 680, 684 (Bankr. E.D.Wash.1993).

7. *See also In re Simons*, 113 B.R. 942, 947 (Bankr.W.D.Tex.1990) (proposal to make partial surrender of collateral to oversecured creditor

for partial credit against debt and payment of balance over time provides creditor with indubitable equivalent of claim); *Matter of Martindale*, 125 B.R. 32, 38 (Bankr.D.Idaho 1991) (while proposal to sell portion, immediately surrender another portion, and surrender remainder of collateral after 300 days if unsuccessful at selling, might in theory provide oversecured creditor with indubitable equivalent of its claim, such proposal did not in this case).

the bankruptcy court at $1,100,000.00, was encumbered by a mortgage securing a debt of approximately $589,000.00. The debtor proposed in its Chapter 11 plan to surrender only 400 acres, or more if the court's per acre valuation required, in full satisfaction of the creditor's claim of $589,000.00. The creditor rejected the plan and objected to a cramdown confirmation, arguing, among other things, that the plan was not fair and equitable because the plan did not provide it with the "indubitable equivalent" of its secured claim. The debtor, on the other hand, asserted that, based upon the values set by the court, the surrender of the 400 acres would provide the creditor with the "indubitable equivalent" of its secured claim.

The court began by acknowledging that, as a legal proposition, the debtor's proposal could satisfy the indubitable equivalent standard:

> We must agree that if the land being conveyed under the plan to [the oversecured creditor] is worth the amount of its claim, that the indubitable equivalent test is met and that the objections raised would lack merit. The problem arises in determining whether the land offered is worth the amount of the claim. This is really more a practical problem than a theoretical problem. And the cause of the problem is the debate inherent in establishing a value for real estate.

*Walat Farms*, 70 B.R. at 333. The court then noted that, unlike commodities such as barrels of oil or other easily valued items such as jewelry or automobiles, real estate is a "unique commodity" that is virtually impossible to value with any certainty. *Id.* at 333–34. For this reason, the court did not believe that the debtor could, regardless of the number of acres it proposed to surrender, sustain its burden of proving that the quantity of acres offered to the creditor was sufficient to provide it with the indubitable equivalent of its claim:

> We need not make a pronouncement that no plan proposing the surrender of a portion of mortgaged land to a mortgagee in return for a compelled release of the lien on the remainder of the property will ever be confirmed. Suffice it to say, however,

that no matter how hot the market for real estate may become in the future, the market for farm real estate here and now is not such which would permit us to hold that the value of the land being offered is the indubitable equivalent of [the secured creditor's] claim ...

> ... [W]e further hold that on the facts here we can profess no greater certainty as to the value of such land than [the creditor] itself. Therefore, if [the creditor] is not satisfied by an increase in the number of acres offered, we will be unwilling to force it to take it in return for a release of its lien on the remainder of the land. Moreover, by such a process, a point is likely to come where the proponents would do violence to the "fair and equitable" standard by paying [the creditor] more than its claim, ... which is likely to engender objections elsewhere.

*Id.* at 334–35 (citations omitted).

Thus, the *Walat Farms* court makes clear that its hesitancy in confirming the debtor's plan stems not from any legal prohibition against the partial surrender of an oversecured creditor's collateral in full satisfaction of its claim, but from the practical difficulties caused by the inherent vagaries in valuing real estate. In truth, the court was simply concerned that its valuation of the farmland might ultimately turn out to be wrong, so that the creditor would not, when it went to sell the property, actually receive the "indubitable equivalent" of its claim. This concern has been shared by other courts when faced with similar plan proposals:

> Perhaps at a different time in a different real estate market a plan proposing to surrender mortgaged land to the mortgagee may be confirmable. However, in an uncertain market it is doubtful that such a plan offers the creditor the indubitable equivalent of its claim unless the appraised value of the property, demonstrated by competent proof, far exceeds the amount of the debt to be paid.

*Matter of Martindale*, 125 B.R. at 38.

Of course, this risk is present in any case in which a court is required, under section 506(a), to make a judicial determina-

tion of value. A court cannot be the guarantor of the values it sets during the course of a bankruptcy case. Indeed, the very professionals whose job it is to determine real estate values, real estate appraisers, cannot be certain that the value they place on a piece of property is the price that the owner will receive for it on the open market. The court's observation in *Walat Farms* that real estate cannot be valued with the same certainty that stocks, commodities or other commercial goods traded on an organized market can, is undeniable.

 Nevertheless, a debtor need only prove that its proposal provides a creditor with the "indubitable equivalent" of its claim by a preponderance of the evidence,[8] and in this case, both parties' appraisers were in complete agreement that $52,500.00 was an appropriate value for any one of the Hunters Green units. The only dispute as to value was whether it was appropriate to discount this value to take account of the fact that California Federal was required under the Plan to take delivery of multiple units and would therefore incur the holding costs and risks inherent in selling the units itself. In finding the value of the fourteen units to be $627,223.00, this court adopted, without change, California Federal's position on this issue. It is, therefore, difficult to imagine a more compelling set of circumstances for finding that a debtor has sustained its burden of proving that the partial surrender of an oversecured creditor's collateral in full satisfaction of the creditor's claim provides that creditor with the "indubitable equivalent" of its claim. Accordingly, I conclude that Debtors are able, if they choose to amend their plan, to sustain their burden of proving that surrender of thirteen of the fourteen Hunters Green units to California Federal provides it with the "indubitable equivalent" of its claim of $573,507.32, as required under section 1129(b)(2)(A)(iii) for the Plan to be considered "fair and equitable". Should they choose to amend their plan the same shall be due on or before September 20, 1994, or a status conference will be scheduled.

### ORDER

Pursuant to the foregoing Findings of Fact and Conclusions, IT IS THE ORDER OF THIS COURT that the Objection to Confirmation of California Federal, FSB is hereby SUSTAINED.

FURTHER ORDERED that Debtors have twenty (20) days from the date of entry of this Order to amend their plan to bring it into conformity with the opinion herein.

---

**8.** *See Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1165, n. 26 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993); *In re Westwood Plaza Apartments,* 147 B.R. 692, 698 (Bankr.E.D.Tex.1992).