**In re D & A REALTY, INC., Fed. Tax ID # 74–2339947, Debtor.**

**In re Cecil McDONALD, SS # 463–10–2678, Debtor.**

**Bankruptcy Nos. 92–21915– L–11, 92–21916–L–11.**

United States Bankruptcy Court, S.D. Texas, Laredo Division.

Dec. 22, 1994.

Leela Fireside, Hal Morris, Office of the Atty.Gen., Environmental Protection Div., Austin, TX, for Texas Natural Resource Conservation Com'n.

J. David Brown, Johnson, Curney & Fields, P.C., San Antonio, TX, Colin K. Kaufman, Gene Garcia, Corpus Christi, TX, for debtor.

Lydia A. Gonzalez, Texas Rural Legal Aid, Inc., Weslaco, TX, for El Cenizo residents.

Richard Marlar, Corpus Christi, TX, for U.S. Trustee.

Anna Laura Cavazos Ramirez, County Atty., Laredo, TX, for Webb County, Tex.

John Judge, Brim, Arnett & Judge, P.C., Austin, TX, for United Independent School Dist.

## MEMORANDUM OPINION ON PLAN CONFIRMATION

RICHARD S. SCHMIDT, Bankruptcy Judge.

Before the Court is the Third Amended Plan of Reorganization ("the Plan") of Debtor, D & A Realty, Inc. of Creditors Texas Natural Resource Conservation Commission, Webb County, United Independent School District, and The Estate of Ramiro Elizondo, Deceased, and further endorsed by Texas Rural Legal Aid, Inc. ("Plan Proponents"). The Court, having heard the evidence and arguments of counsel, and having reviewed the pleadings on file herein, makes the following findings of fact and conclusions of law:

### INTRODUCTION

In enacting Title 11 of the United States Code, Congress recognized that debtors could be reorganized to fulfill beneficial financial and equitable purposes. In satisfying those purposes, Bankruptcy Courts throughout the United States have successfully reorganized air lines, bus lines, retail stores and many other large and small businesses. Before the Court today is the attempted reorganization of a low-income housing project on the border between the United States and Mexico, also referred to as *colonias*. For the reasons stated below this Court finds that the Plan should be confirmed.

### HISTORY OF CASE

D & A Realty, Inc. ("Debtor") is a closely held S corporation owned by ten separate trusts. The Debtor is in the land sales and development business in Webb County, Texas. As a part of that business, the Debtor issued contracts for deeds for the sale of lots in two subdivisions, the City of El Cenizo and the Rio Bravo Annex. The City of El Cenizo includes approximately 900 lots. The Rio Bravo Annex includes approximately 200 lots. The Debtor also owns other assets including lots, percentage ownership in lots in the Rio Bravo Annex, 37 acres in La Presa Subdivision, and land upon which the Rio Bravo Shopping Center stands.

Early in the course of this bankruptcy, it became apparent that the Debtor's manager, Cecil McDonald, was either unwilling or unable to conduct the operations of the Debtor in accordance with reasonable business practices and the environmental laws of the State of Texas. Continuing environmental problems, accounting problems, and legal problems experienced by the Debtor affected the lot owners in the subdivisions. Because the Bankruptcy Code offered perhaps the only remedy for all of these problems through reorganization, the Court fashioned relief which would protect the creditors and the lot owners, and maintain the Debtor–in–Possession. At that time, insiders of the Debtor–in–Possession were the only entities with the available financial resources to reorganize the Debtor and thereby solve the legal, financial and environmental problems for the betterment of all parties. The Court appointed an engineer to study the environmental problems and propose a solution. The Court appointed an accountant to review all of the contracts for deeds and report on the amount owed by each lot owner. The Court also placed strict limits on the operations of the Debtor. Despite this judicial assistance, the Debtor continued to ignore the requirements of the Bankruptcy Code and was unable to propose a confirmable plan of reorganization.

While in bankruptcy, the Debtor retained three different attorneys to prosecute the reorganization. On many occasions the Court announced that reorganization would require solving the environmental problems and assuring the Court of the feasibility of the Plan.

The Debtor's principal, Cecil McDonald ("McDonald"), has been unwilling to understand that the Debtor has the responsibility to satisfy the environmental laws of the State of Texas. This Court often stated that it does not have authority to set water policy for the State of Texas. Such authority lies solely within the purview of the Texas Natural Resource Conservation Commission. Despite the Court's instructions, the State's instructions, and the Court-appointed engineer, McDonald continued to violate state laws and in fact, violated bankruptcy law by hiring professionals without the Court's permission in order to circumvent his responsibility to the lot owners. As a result, the Court finally took McDonald and the Debtor out of possession and appointed a Trustee.

While the environmental problems that plague the residents of these subdivisions are the most pressing, a simple review of the financing agreements and contracts of deeds used by the Debtor in these subdivisions shows that there are also numerous potential legal problems, including potential violations of various Federal and State lending laws.

In the face of all of these problems, the Plan Proponents, with the use of Federal Community Block Grant funds from the Texas Department of Housing and Community Affairs, have proposed this Plan. This is perhaps the first Plan ever proposed by a State entity in a Bankruptcy Court. While the idea may be novel, the purposes and the effect of this Plan squarely fall within the equitable principles the Bankruptcy Code.

### STANDARDS FOR CONFIRMATION

The Court finds it difficult to see anything but overwhelming good to the general public being accomplished by the Plan. Specifically, it provides a mechanism for permanently solving the environmental problems of the subdivisions. The Plan also solves all title problems and accounting problems associated with the purchase of lots by the residents in the subdivisions. It converts ownership of the lots from the Debtor with a contract of deed to the purchaser with a Deed of Trust in favor of the reorganized Debtor. The Plan sets up a non-profit organization to oversee collection of the notes and operation of the reorganized Debtor.

11 U.S.C. § 1129 sets out the standards a Plan must meet for confirmation. The Plan is in conformance with these standards in the following ways:

1. The Plan complies with the applicable provisions of the Bankruptcy Code.

2. The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code.

3. The Plan has been proposed in good faith and not by any means forbidden by law. Because the State of Texas is a Plan Proponent in this case, good faith can arguably be inferred by their public status. This Court, however, specifically finds that the Plan Proponents have in fact proposed the Plan in good faith. The Plan has been proposed in order to end the legal and environmental quagmire associated with the subdivisions.

4. All payments to be made by the Plan Proponents in connection with this case have been approved or are subject to approval of this Court as reasonable.

5. The Plan Proponents have disclosed the identity and affiliation of all individuals that shall serve as principals of the reorganized Debtor after confirmation of the Plan.

6. There are no governmental regulations or commissions with jurisdiction over rates charged by the Debtor.

7. With respect to each impaired class of claims or interest, each impaired class of claims has accepted the Plan or will receive under the Plan an amount that is not less than the amount the holder would receive under Chapter 7 of the Bankruptcy Code. A liquidation analysis of the Debtor in Chapter 7 concludes that there is no equity in this Debtor. Therefore, the interest holders of the Debtor would receive nothing under Chapter 7.

8. The Plan does not discriminate unfairly with respect to the interest holders and is "fair and equitable" to the interest holders. Specifically, the Plan does not violate the "absolute priority rule, which "requires that the holder of a [senior] claim must receive the full amount of its allowed claim unless all junior claims and interest will receive no property and retain no interest under the plan." *In re Patrician St. Joseph Partners, Ltd.,* 169 B.R. 669, 682 (D.Ariz.1994); 11 U.S.C. § 1129(b)(2)(B).

9. All administrative and priority claimants have accepted the Plan, and all tax claimants under the Plan are being paid in accordance with the Code.

10. At least one class of claimants that is impaired under the Plan has accepted the Plan.

11. Confirmation of this Plan is not likely to be followed by liquidation or the need of further financial reorganization.

12. All appropriate fees have been paid or will be paid on the effective date of the Plan.

13. There are no retirement benefits to be paid under the Plan.

## DISCUSSION OF THE PLAN

The Plan is a liquidating plan which calls for management of the Debtor by a Liquidating Trustee who will dispose of the assets in an orderly fashion and work with public officials to put in place new infrastructure to solve the environmental problems. The principal assets of the Debtor are real estate and accounts receivable from the remaining 622 lots, which will be sold to a non-profit corporation established by the Texas State Affordable Housing Corporation for the sum of $500,000.00. All of the executory contracts for deeds will be accepted by the Trustee and purchased by the non-profit corporation. The funds for the purchase will be loaned to the non-profit corporation by the Texas Department of Housing and Community Affairs. From the cash flow received by the non-profit corporation from collection of the outstanding balances on the 622 lots, the non-profit corporation will repay the Texas Department of Human and Community Affairs and will establish various funds to be used to improve the properties in question and to loan money to residents for repairs on their homes. In addition, the non-profit corporation will fund the construction of the Rio Bravo Water Treatment facility. The water facility will then be operated by Webb County.

The Liquidating Trustee will be empowered to collect fraudulent transfers and preferences from insiders and others who have improperly or unlawfully received funds from the estate.

The Plan provides for the payment of all administrative expenses on the effective date of the Plan with the exception of the administrative claim of the Texas Natural Resource Conservation Commission and Webb County for post-petition civil fines and penalties for violation of Texas Environmental Protection laws. These two claims will be voluntarily subordinated to the claims of all allowed creditors, but ahead of the equity interest holders. The Court conducted an estimation hearing on the value of the two claims. The evidence at the estimation hearing convinced the Court that the administrative claim of the Texas Natural Resource Conservation Commission should be estimated for Plan confirmation purposes; i.e., voting and feasibility, in excess of $4 million dollars.

The secured claims of Eddie McDonald, Bonnie McElroy, Augustin Vela and Ira Matt to the extent they are allowed by the Court will be paid in full on the effective date of the Plan.

The secured claim of DeEsther Brabant, the former wife of the Debtor, is to be paid upon sale of the real property in Cameron County securing her claim. The Plan provides that the adequate protection for this claim would be the payments made post-petition without the permission of the Court by the Debtor to DeEsther Brabant. The Court finds that the Plan adequately provides for the claim of DeEsther Brabant in that it provides the indubitable equivalent of her security and treats her fairly. *In re May,* 174 B.R. 832 (Bankr.S.D.Ga.1994); *Matter of Sandy Ridge Development Corp.,* 881 F.2d 1346 (5th Cir.1989).

The Plan leaves intact settlement of the claims of the United Independent School District ("UISD") and provides for payment of $450,000.00 to UISD.

The unliquidated tort claim for wrongful death brought by the estate and heirs of Ramiro Elizondo shall be paid in full by the Creditors' Trust in the amount of $1.5 million payable monthly with interest at 8%. The Court has reviewed the evidence submitted with respect to the claim surrounding the death of Ramiro Elizondo and finds that this settlement meets the tests set out in *Protective Committee v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), and thus should be approved.

Finally, the Plan then provides that any residual funds shall be paid first to allowed unsecured claims, then for the payment of any out-of-pocket expenses and costs incurred by attorneys representing creditors of this estate that have substantially benefitted the estate, then for the payment of the allowed claims of the Texas Natural Resource Conservation Commission and Webb County, with any remaining sums paid to the equity interest holders.

### OBJECTIONS TO CONFIRMATION

■ While there are a number of objections raised by equity interest holders, the resolution of which has been discussed above, the primary objection is that it is not fair for the Plan Proponents to be able to purchase the property owned by the Debtor for $500,-000.00. The principal balance of the accounts has been calculated at $3,845,771.16. The equity holders believe that the Court should value the property at a minimum of $4,000,000.00. The position of the equity holders is incorrect for several reasons.

The value of the unpaid contracts on the 622 lots must discounted due to the potential legal claims arising out of the financial transactions surrounding lot purchases. Although the Court is not prepared to rule on alleged violations of consumer protection statutes, a simple reading of the transaction documents shows that there are *per se* violations of the Federal Truth in Lending statute under 15 U.S.C. § 1601 et seq. and violations of the Federal Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1709(a) and (c). The Attorney General of the State of Texas alleges potential violations of §§ 8.01 and 8.03 of the Texas Debt Collection Act and § 17.46 of the Texas Business and Commerce Code Deceptive Trade Practices Act. The Attorney General also alleges common law causes of action exist against the Debtor for usury, unreasonable debt collection efforts, and fraud. Thus, the fair market value of the accounts should be severely discounted. In fact, it would be difficult to find a buyer for the accounts under these circumstances because, absent a bankruptcy plan, the accounts could only be verified and liquidated via 622 individual law suits. Moreover, resolution would likely require declaratory judgment actions in Federal Court because many of the alleged violations involve Federal questions. The cost of these actions would be astronomical. The time delay might well be several years.

In addition, the administrative claim of the Texas Natural Resource Conservation Commission and Webb County has been filed for $19 million dollars. This Court found above that the claim should be estimated for voting purposes and plan confirmation process in excess of $4 million dollars. Thus, any equity in this case, even the reorganized case, would be eaten up by this claim.

■ Finally the Bankruptcy Code does not provide for the protection that the equity interest holders are seeking. The exclusivity period in § 1121(b) of the Code protects equity holders from a third party attempt to purchase estate assets for less than fair market value. The Code grants the Debtor the exclusive right to reorganization for a period of 120 days. In this case, the Debtor has had, for all practical purposes, an exclusivity period of two years and has proposed at least two plans, neither of which were confirmable.

■ The Code only requires that the Court find that each holder of a claim or interest will receive as much as they would receive under Chapter 7 and that the Plan be fair and equitable with respect to all claims and interest holders. This means that junior interest holders are protected from senior interest holders getting more than the

amount of their claim and no junior interest holder will receive anything until seniors are paid in full.

The liquidation value of this Debtor here is zero. The Plan and the Disclosure Statement submitted by McDonald on behalf of the equity interest holders so stated and he is judicially estopped from claiming differently.

■ No senior claimant herein is receiving more than their claim. The equity holders argue that the State is purchasing the assets for $500,000.00. This is not true. Under this Plan a third party non-profit corporation is purchasing the assets for $500,000.00. The non-profit corporation is not subject to the fair and equitable test set out in the Code.

Perhaps the equity holders are arguing that the Plan is not fair or equitable under general notions of equity and fairness. This argument also fails. The lot owners have overwhelmingly voted in favor of the Plan and thereby have expressed their opinion that their settlement under the Plan is fair and equitable. The public in general is well-served by this Plan because it cleans up significant environmental problems. The equity holders have been treated fairly because they were given over two years to propose a confirmable Plan and have been unable to do so.

This Plan has been on the table for several months and no alternate Plan was presented prior to the confirmation hearing. The Court even instructed the Debtor on what it would take to confirm a Plan—cure the environmental problems and have sufficient funds or guarantees of funds to prove the feasibility of the Plan. The Court even hired an expert for the Debtor to tell him how to solve the environmental problems. Still, the Debtor was unwilling or unable to propose a confirmable Plan. Under these circumstances, this Plan is eminently fair. In fact, the end result of almost all creditors' plans is that existing shareholders' interests are wiped out.

The equity holders' patronizingly argue that they would treat the lot owners better than the non-profit corporation would. The lot owners' votes in favor of the Plan make such a position is untenable. Moreover, the Plan proposes that each of the lot owners may elect to convert their contract of deed into a note and deed of trust with a note. Without question, ownership of the lots subject to a deed of trust is a far better legal position for the lot owners than a contract to provide a deed when all payments are made. In addition, the Plan provides for lower monthly payments by lot owners by virtue of lowering the interest rate to 8%, and by lowering the principal to an amount calculated and set out in the Plan. The consideration for lowering the interest rate, lowering the principal, and substitution of the contracts for deed with Deeds of Trust, is the release of the reorganized Debtor and associated entities from any liability under the various Federal and State consumer protection acts described above. The Court finds that this compromise is reasonable, meets the tests set out in *Protective Committee v. Anderson, supra*, and should be approved.

■ Eddie McDonald, a creditor of the Debtor, has objected to his treatment under the Plan. Eddie McDonald holds a note secured by the Rio Bravo Shopping Center and the Cecil McDonald duplex as described in the Plan. The shopping center has now been sold and the cash value of the shopping center is held in escrow. The Plan provides for satisfaction of Eddie McDonald's claim by conveying the duplex to him for a value to be determined by the Court. The remainder of the claim will be satisfied out of the cash from the shopping center. The Court finds that this treatment is fair and equitable in that it provides the indubitable equivalent of the claim. *In re May, supra; Matter of Sandy Ridge Development Corp., supra.* The land being conveyed under the Plan is worth the amount of the claim by definition. If the Plan Proponents and Eddie McDonald cannot agree on the price, the Court will litigate the issue.

## CONCLUSION

The authors of the Bankruptcy Code probably did not envision using Chapter 11 for quieting title to 622 lots in *colonias* located on the Rio Grande and improving the water and sewer systems thereon. With this Plan,

the cooperation of the Federal, State and County governments, and the flexibility of the Bankruptcy Code, such a process is not only possible but is eminently appropriate. The Plan is in the best interest of the public, in the best interests of the claimants of this estate, meets the provisions for confirmation under Title 11, and should be confirmed. A separate Order shall be entered herewith.

### ORDER CONFIRMING PLAN OF REORGANIZATION

Before the Court is the Third Amended Plan of Reorganization ("the Plan") of Debtor, D & A Realty, Inc. of Creditors Texas Natural Resource Conservation Commission, Webb County, United Independent School District, and The Estate of Ramiro Elizondo, Deceased, and further endorsed by Texas Rural Legal Aid, Inc. ("Plan Proponents"). The Court, having heard the evidence and arguments of counsel, and having reviewed the pleadings on file, and in conformance with the findings of fact and conclusions of law entered herewith, finds that the Plan should be confirmed.

It is therefore ORDERED that the Third Amended Plan of Reorganization of D & A Realty, Inc. of Creditors Texas Natural Resource Conservation Commission, Webb County, United Independent School District, and the Estate of Ramiro Elizondo, Deceased, and further endorsed by the Texas Rural Legal Aid, Inc. is hereby CONFIRMED.