**In re RICHFIELD 81 PARTNERS II, LLC, Debtor.**

**Richfield 81 Partners II, LLC, Movant,**

v.

**SunTrust Bank, Respondent.**

**No. 10–73883.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Feb. 9, 2011.

James L. Paul, Chamberlain, Hrdlicka, White, et al., Atlanta, Ga, for Debtor.

## ORDER DENYING AMENDED MOTION TO VALUE PROPERTY

JAMES E. MASSEY, Bankruptcy Judge.

Richfield 81 Partners II, LLC, the Debtor in this Chapter 11 case, moves for an order valuing real property in connection with its plan of reorganization. Respondent SunTrust Bank holds a claim against Debtor in the range of $1,350,000 to $1,400,000 secured by a first priority security deed on Debtor's sole asset, a 16.614 acre tract of unimproved land in Henry County, Georgia. In its plan of reorgani-

zation, Debtor proposes to restructure the terms of the debt owed to Respondent and, if Respondent rejects that proposal, to transfer some portion of the collateral (and preliminarily a portion of the collateral consisting of 5.65 acres) to Respondent in full satisfaction of the debt.

The alternative proposal to transfer a portion of Respondent's collateral in satisfaction of its claim is colloquially referred to as a "dirt for debt" or "eat dirt" plan. A plan of reorganization in a Chapter 11 case may be confirmed over the objection of an impaired secured creditor if the so-called "cram-down" provisions in section 1129(b) of the Bankruptcy Code are satisfied. These provisions in section 1129(b)(1) and (b)(2)(A) state:

> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
>
> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
>
> (A) With respect to a class of secured claims, the plan provides—
>
> (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least

the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(1) and (b)(2)(A).

Section 1129(b)(2)(A) sets out three alternative methods by which a plan may seek to satisfy the "fair and equitable" condition. Debtor relies on subsection 1129(b)(2)(A)(iii), contending that the transfer of a 5.65 acre portion of the 16.614 acre tract presently securing Respondent's claim would enable Respondent to realize the indubitable equivalent of its claim. In other words, Debtor in effect asserts that Respondent could sell the 5.65 acre tract and receive, net of selling, maintenance, insurance and any other necessary and reasonable costs, the present value of the entire debt owed to it by Debtor as of the date on which such a transfer would close following confirmation of its plan.

Debtor contends that the 5.65 acre tract is worth $1,600,000, which it says is at least $200,000 more than the debt owed to Respondent and that the equity cushion makes the value of the 5.65 acre tract the indubitable equivalent of payment in cash of Respondent's claim.

Judge Learned Hand coined the term "indubitable equivalence" *in In re Mural Holding Corp.,* 75 F.2d 941 (2d Cir.1935) in the context of a case under Chapter X of

the Bankruptcy Act. There, the debtor proposed a plan modifying a mortgage by providing to the secured creditor interest only payments for ten years. The secured creditor moved for relief from a stay of the prosecution of a foreclosure suit in state court. The lower court denied the motion, presumably indicating that the proposed plan was confirmable. The Court of Appeals reversed, stating:

It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Id.* at 942.

■ To meet the standard of "indubitable equivalence," Debtor must show that the 5.65 acre tract (1) would provide Respondent with the present value of its claim and (2) would insure the safety of or prevent jeopardy of the principal. *In re Arnold & Baker Farms,* 85 F.3d 1415, 1422 (9th Cir.1996); *In re Sparks,* 171 B.R. 860, 866 (Bankr.N.D.Ill.1994). The burden rests on the debtor to show by a preponderance of the evidence that its plan satisfies the requirements of 11 U.S.C. § 1129(b). *In re Atlanta S. Bus. Park, Ltd.,* 173 B.R. 444, 448 (Bankr.N.D.Ga. 1994). That burden cannot be satisfied merely by proving a value based on a projected sale of the substituted collateral at some indefinite time in the future. The issue of whether a plan provides a creditor with the indubitable equivalent of its secured claim is a mixed question of law and fact. *In re Arnold & Baker Farms,* 85 F.3d at 1421.

In support of its proposed dirt for debt plan, Debtor relies on *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.),* 881 F.2d 1346 (5th Cir.1989), *rehearing den.,* 889 F.2d 663, in which the Fifth Circuit Court of Appeals held that a creditor receives the indubitable equivalent of its secured claim when it receives all of the property to which its lien attaches. That case is not helpful because the secured creditor in that case was undersecured and the guarantors were not to be released. Here, Debtor contends that Respondent is highly over-secured and that the transfer of a portion of the entire collateral would fully satisfy Respondent's claim. All that the *Sandy Ridge* case stands for is that "distribution of estate property, at values properly fixed by the bankruptcy court, to nonconsenting creditors under a liquidating reorganization is not per se categorically prohibited as a matter of law under Chapter 11 of the Bankruptcy Code." *Sandy Ridge,* 889 F.2d at 663.

■ Debtor also cites *In re May,* 174 B.R. 832, 837 (Bankr.S.D.Ga.1994) and *In re Atlanta So. Bus. Park, Ltd.,* 173 B.R. 444 451–452 (Bankr.N.D.Ga.1994) in which the bankruptcy courts held that a partial surrender of collateral could provide an oversecured creditor with the indubitable equivalent of its claim. The facts in these cases with respect to market conditions differ considerably with the facts here, however. Given that "indubitable" is generally accepted to mean "too evident to be doubted," case law and common sense instruct that unfavorable market conditions undercut the certainty in valuation necessary for a determination of "indubitable equivalence." *See In re Walat Farms,* 70 B.R. 330, 334 (Bankr.E.D.Mich.1987) (citing Webster's Ninth New Collegiate Dic-

tionary (1985) for the definition of "indubitable.").

Though broad, the phrase "indubitable equivalent" is not unclear. Indubitable means "not open to question or doubt," Webster's Third New Int'l Dictionary 1154 (1971), while equivalent means one that is "equal in force or amount" or "equal in value," *id.* at 769. The Code fixes the relevant "value" as that of the collateral. See 11 U.S.C. § 1129(b)(2)(A)(iii) (requiring the "indubitable equivalent" of the secured claim); *id.* § 506(a) (defining a secured claim as "the extent of the value of such creditor's interest in the estate's interest in such property"). Thus the "indubitable equivalent" under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral.

*In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 310 (3d Cir.2010). For illiquid real property to be the "equivalent" of a cash claim, the ability to liquidate the property fairly quickly is a most important consideration because of the impossibility of predicting future market conditions with indubitable certainty.

▆ The Court held an evidentiary hearing on Debtor's motion to value its property on January 6, 2011. For the reasons stated below, the Court finds that the evidence presented is insufficient to value the property in question for the purpose of determining whether that value would be the indubitable equivalent of Respondent's claim.

At the January 6, 2011 hearing, the Debtor presented two witnesses and tendered several exhibits. Although counsel for Respondent cross-examined the witnesses, Respondent presented no evidence.

Based on the evidence presented the Court makes the following findings of fact.

Debtor is a limited liability company that owns a 16.614 acre tract of unimproved land shown on Exhibit 55, which fronts State Highway 81 about 1,200 feet north of State Highway 20 in Henry County, Georgia (the "Property"). Three entities purchased the Property as joint tenants approximately eight years ago and subsequently contributed their interests in the Property to Debtor for their membership interests.

JH–80, one of the members of Debtor, and another entity owned by two individuals, own 100% of an adjacent development known as South Point Mall through an entity known as South Point Retail Partners. The development of the Mall has been a work in progress for more than four years, as illustrated by the photographs on Exhibit 56 and explained by Debtor's first witness, James Baker. Mr. Baker is president of JH–80. There remain unsold and unleased subparcels of land that are part of the Mall project. The evidence does not show precisely how much land could be sold or leased for commercial development in the Mall project and in nearby properties.

In its motion, Debtor seeks to value a portion of the Property consisting of 5.65 acres that has 300 feet of frontage on Highway 81 (the "Subparcel"). Mr. Baker was asked "the reason that a particular tract was identified by the Debtor for valuation." (Transcript, January 6, 2011 Hearing, p. 33.) Mr. Baker responded:

Well, when we were looking at the tract and trying to determine what would be the most realistic and the most logical for the bank and for anyone, for that matter, in the area, to be transferred, it would be the tract of property that forms the corner. There's only one tract that forms the corner of the subject 16–acre property that's owned by the Debtor, and it is formed at the cor-

ner of the entrance of what we call Old Greenwood Road and Highway 81. So it's simply about, you know, a little more than a third of the property, and it's on an area that is the simplest to develop or dispose of because it already has an access cut and it's already sitting there, you know, primed, if you will, so it would be—

*Id.* The Court asked Mr. Baker why he did not just dispose of the Subparcel. The testimony and subsequent questions from the Court were as follows:

THE WITNESS: Well, Your Honor, I think probably and if we're at here, it's still our modus operandi is that we would not sell that property for $283,000 an acre. Our asking price for that property in total is $750,000 an acre, and we're selling individual parcels, trying to receive around $800,000 an acre. And there's been no sales that we've made that haven't been able to be obtained. So I realize that if we were just going out to sell 5.65 acres, it's true, we may be able to sell it much quicker than—and obviously perhaps on the spot, but that's not been our desire. In fact—

THE COURT: Yeah, but that doesn't matter because your desire is to give the 5.6 to the bank.

THE WITNESS: Well—

THE COURT: It's the same thing. You don't have the property after the deal closes if you—

THE WITNESS: That's true.

THE COURT:—right?

THE WITNESS: That's true, Your Honor. And not to—you know, I initially—I personally have met with the bank on two separate occasions to try to mediate this transaction and just allow them to let us pay them, and they've been unwilling to do that. They want all their money, and I understand that. But, you know, for us to—you know, we

have a great deal of complex issues that are outside just the Debtor here that I'm involved with, and obviously we have to look at everything as a whole. We're simply—you know, I have personally gone to SunTrust, met with their—

(Tr. pp. 34–35.)

The failure of Debtor to put the Subparcel on the market strongly suggests that Mr. Baker, who is a real estate developer with extensive knowledge of the market in that area, did not think that the Subparcel could be sold in less than a year. His testimony further shows that he perceives a conflict in offering the property for sale arising from "complex issues that are outside the Debtor here." The conflict is likely to be the fear that putting the Subparcel on the market could hurt sales of parcels by South Point Retail Partners. The reverse would also be true—that the sales or leases of properties by South Point or surrounding land owners could dampen the demand for the Subparcel and thereby lower the price at which it could be sold. Debtor's evidence failed to address the competition in the market surrounding the Subparcel, and that lack of evidence is fatal to its contention about value.

Tom Carson, the Debtor's expert witness, valued the Property in July 2010 at $4,650,000, which he said on a per acre basis amounted to "$283,000 and some change." (Tr. pp. 89–90.) That valuation included a downward adjustment from $4,676,000 for the cost of removing a burned-out house. (Tr. p. 87.) He valued the Subparcel at $283,000 per acre based on his valuation of the Property, making no adjustments other than for the fact that the house had been removed and for the difference in the sizes of the Subparcel and the Property. (Tr. pp. 88–90.)

Dr. Carson examined seven sales of properties, all of which were two to almost three years ago, which he deemed comparable to the Debtor's Property. These properties are located as far away as six miles from the Property and no closer than two miles. For each sale, Dr. Carson made adjustments (upward and downward) to those sale prices based on characteristics of each such property relative to the same characteristics of the Debtor's Property. The factors he considered with respect to one or more of those sales relative to the Property were size (5 of the comparable properties), road frontage (1 property), exposure (1 property), traffic counts (1 property), proximity to a well-developed commercial center (1 property), accessibility (3 properties), location (2 properties), proximity or not to I–75 (2 properties), and being closer to immediate development because the property had all utilities in place (1 property). All of these comparisons were to Debtor's entire Property, not the 5.65 acre Subparcel.

Dr. Carson provided no information about how he computed each "adjustment," i.e., the amount he added or subtracted from the sale price per acre. He cited no standard against which any such adjustment would be measured. He did not opine or show any supporting evidence as to the market conditions prevailing at those locations at the times of the respective sales. He did not explain why any of the property he chose as a comparable was comparable in any way other than it was unimproved. The adjustments are unsupported by any evidence, are known only to Dr. Carson and for all the Court knows could be entirely arbitrary.

In addition to the foregoing, the Court finds that Debtor failed to prove the value of the Subparcel for the following reasons.

First, Dr. Carson testified that the Subparcel was contiguous to South Point Mall but then admitted it was not. This inconsistency greatly diminished the reliability of his opinion because he plainly considered access to the Property to be a very important component to its value, which his adjustments to amounts of comparable sales reflect, as discussed above. The portion of the Property other than the Subparcel does have access to the Mall, but Debtor deliberately denied access to the Mall from the Subparcel as shown on Exhibit 55 by creating a panhandle of land adjacent to the cell tower. The Court fails to understand how Dr. Carson could have thought that there was access to the Mall from the Subparcel.

Second, Dr. Carson did not appraise the Subparcel as of January 6, 2011 but rather derived the value from the July 2010 appraisal based on the minor adjustments mentioned above. Hence, the appraisal testimony of Dr. Carson speaks as of July 2010, there being no evidence to support a conclusion that Dr. Carson examined any sales in the period from the date of his 2010 appraisal to the date of the hearing.

Third, Dr. Carson did not state how long it would take to sell the Subparcel or even that he gave any consideration as to how long it would take to sell the Subparcel. Although he did testify that he based his opinion of value of the Subparcel on the value of the Property, his July 2010 opinion of the value of the Property was based on his opinion that the Property could be sold within one year. There is no evidence to support that opinion. That sales of other parcels in other locations miles from the Subparcel took place one or two years prior to July 2010, does not prove that the Subparcel could be sold for $1,600,000 or even $1,000,000 in any reasonable period of time for which the valuation is sought.

Fourth, Debtor failed to present any evidence to show there is any current demand for raw land in the immediate vicini-

ty of the Subparcel that is not a part of the Mall property; indeed, Mr. Baker's testimony strongly suggests that there is no significant demand so long as South Point Mall is a competitor in selling raw land. This lacuna undermines the approach used by Dr. Carson because his opinion of value is based strictly on what a few other properties located miles from the Subparcel sold for two or more years ago, with no indication of how long those sellers had those properties on the market. His approach took no account of the level of demand in the area near the Subparcel.

Fifth, the comparables of sales that took place in 2008 are suspect due to the lapse of time in the absence of any showing that the market conditions in 2008 with respect to each of those comparables is substantially similar to those prevailing now in the area of the Subparcel.

Sixth, the appraisal was based in part on the property being zoned commercial because Dr. Carson "wrote in [his July 2010] report C–2 commercial." (Tr. p. 91.) But he appeared to base his conclusion that the zoning was commercial based on how the property is being assessed and what some land use plan states and not on his review of the actual zoning of the Subparcel. *Id.*

Seventh, Dr. Carson did not address the effect of the recession on property prices. His testimony as to when the recession started was not supported by any other evidence, and the Court is unable rely on it. The prices for all but one of his comparable sales in 2009 were considerably lower than two of his more favored comparable sales in 2008. He brushed off these properties as less comparable to the Subparcel, but the prices could have reflected lack of demand, a condition that could obtain now in the vicinity of the Subparcel. One is left wondering whether lower prices distinguished these sales more than other factors considered.

For these reasons, Debtor's amended motion to value the Subparcel and the Property is DENIED.

**IT IS ORDERED.**